**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-00363-MSK-NYW

CHARLES F. FRYBERGER d/b/a CHUCK FRYBERGER FILMS,

      Plaintiff,

v.

TRIPTELEVISION, LLC, a Nevada company,
KULIN STRIMBU, an individual,
RICH MEDIA EXCHANGE, LLC, a Colorado company
APPLE VACATIONS, LLC, a Delaware Corporation

      Defendants.

---

### TRIPTELEVISION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

      Defendants Kulin Strimbu and Rich Media Exchange, LLC (collectively referred to as "TTV Defendants"), through counsel, and pursuant to Fed.R.Civ.P. 56, respectfully move the court to enter summary judgment on all of Plaintiff's remaining claims.

### I.      SUMMARY OF ARGUMENT.

      This case arises out of a payment dispute.  TripTelevision, LLC ("TTV") had a contract with Apple Vacations to provide videos that would depict travel destinations and excursions that were part of vacation packages Apple Vacations was selling.  TTV, in turn, hired Plaintiff Charles Fryberger as an independent contractor to make and edit travel videos that would be provided to Apple Vacations for Apple Vacations' use.  TTV promised to pay Plaintiff in arrears for his video production services.

      Plaintiff invoiced TTV for his services.  TTV paid the first few invoices for total payments of $115,399.  The money then became tight and TTV got behind on the invoices for

the last four months of the relationship.  TTV asked Plaintiff to be patient because it intended to pay the invoices but was having cash flow problems.  Plaintiff ultimately lost his patience and terminated his contractual relationship with TTV as of March 22, 2013.

Plaintiff filed this lawsuit two years later.  He alleges five claims for relief: (1) copyright infringement against TTV, Rich Media Exchange, LLC ("RME") and Apple Vacations; (2) contributory copyright infringement against Kulin Strimbu and Elizabeth Holt; (3) vicarious copyright infringement against Kulin Strimbu and Elizabeth Holt; (4) breach of contract against TTV; and (5) civil theft against TTV.  *See Complaint* [Doc. # 1], ¶¶ 84-131.  Ms. Holt was dismissed from the case.  [Doc. # 91].  TTV filed for bankruptcy (Case No. Case No. 15-22647-MER), which resulted in the Court administratively closing this case.  [Doc. # 145].  Apple Vacations settled with the Plaintiff while this matter was administratively closed.  [Doc. # 146].

On January 14, 2021, the Court granted Plaintiff's Motion to Reopen this case as to Defendants Strimbu and RME only.  [Doc. # 150].  The Court set a deadline of February 22, 2021 for the remaining parties to refile dispositive motions on the remaining claims.  [Doc. # 151].  The TTV Defendants file this Motion in accordance with that deadline.

The remaining claims in this case are Plaintiff's first claim for relief (alleging copyright infringement) against RME, Plaintiff's second claim for relief (alleging contributory copyright infringement against Ms. Strimbu), and Plaintiff's third claim for relief (alleging vicarious copyright infringement against Ms. Strimbu).  *See* [Doc. # 1], pp. 7-10, ¶¶ 84-121.  The Court should enter summary judgment on these claims for three reasons.  First, the Settlement Agreement and Release in TTV's bankruptcy is binding on Plaintiff and released all claims related to the adversary proceeding the bankruptcy Trustee filed, which include Plaintiff's claims

here.  Second, on the merits of Plaintiff's remaining claims against Ms. Strimbu and RME, the Court should enter summary judgment because Plaintiff's contract with TTV provided that TTV owns all copyrights to the content.  Thus, Plaintiff cannot prevail on his claims for copyright infringement, contributory copyright infringement, and vicarious copyright infringement.  Third, even if Plaintiff retained the copyright under his contract with TTV, RME and Ms. Strimbu had an irrevocable nonexclusive license to use the videos, which defeats Plaintiff's copyright claims.

## II.   CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT.

**A.   THE COURT SHOULD ENTER SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS BECAUSE THE SETTLEMENT AGREEMENT AND RELEASE BARS PLAINTIFF'S CLAIMS.**

### 1.   Burden of Proof and Elements.

Defendants previously raised the defense that the Settlement Agreement and Release entered in the bankruptcy case bars Plaintiff's claims here.  [Doc. # 147], pp. 4-10.[1]  Defendants bear the burden of proving this defense.  *Leprino Foods Co. v. Feldmeier Equip., Inc.*, No. CIV.A03CV02461-MSK-OES, 2006 WL 278550, at *5 (D. Colo. Feb. 3, 2006).

"Settlement agreements are favored by the courts."  *City & Cty. of Denver v. Adolph Coors Co.*, 813 F. Supp. 1476, 1479 (D. Colo. 1993) (citing *Autera v. Robinson,* 419 F.2d 1197, 1199 (D.C. Cir. 1969)).  "Settlement agreements are construed in the same way as contracts in determining whether and how they should be enforced."  *Id.* (citing *Republic Resources Corp. v. ISI Petroleum West Caddo Drilling Program 1981,* 836 F.2d 462, 465 (10th Cir.1987) and *Mulvaney v. St. Louis Southwestern Railway Co.,* 1992 WL 223771 (D. Kan. Aug. 13, 1992)).

---

[1]   The Court ultimately granted Plaintiff's Motion to Reopen Case [Doc. # 150], but the Court did not substantively rule on these Defendant's argument that the settlement in the bankruptcy matter precluded Plaintiff's claims here.  These Defendants therefore raise the issue here and request the Court enter summary judgment because of the settlement.

"Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (citing *United States v. McCall,* 235 F.3d 1211, 1215 (10th Cir. 2000)).

In Colorado, a settlement and release agreement "is, in effect, a contract to end judicial proceedings." *H. W. Houston Const. Co. v. Dist. Court*, 632 P.2d 563, 565 (Colo. 1981) (citing *Goltl v. Cummings*, 152 Colo. 57, 380 P.2d 556 (1963)).  To find a settlement agreement and release is binding and enforceable, the Court must find there was "a 'meeting of the minds' as to the terms and conditions of the compromise and settlement." *Id.* (citing *Pring v. Udall*, 95 Colo. 23, 31 P.2d 1113 (1934) and 6 Corbin on Contracts s 1278 (1962)).

2.      **The Court Should Enter Summary Judgment Because the Settlement Agreement and Release Approved by the Bankruptcy Court Binds Plaintiff and Bars His Claims.**

a.      **Trustee's Claims in Adversary Proceeding.**

In TTV's bankruptcy, the Trustee filed an adversary proceeding against RME, Streamside, and Kulin Strimbu.  [Doc. # 147-2].  The Trustee alleged in the adversary proceeding that Ms. Strimbu was in charge of the operations and management of TTV, RME and Streamside. *Id.*, ¶¶ 12-19. Further, the Trustee alleged "Rich Media operates the same business as the Debtor, performing the same services as did the Debtor, for essentially the same clients as did the Debtor, pursuant to the essentially same or similar contracts as the Debtor." *Id.*, ¶ 19. The Trustee alleged that TTV and Ms. Strimbu improperly transferred assets to RME and Streamside, which "was done with the actual intent to hinder, delay, or defraud creditors of the Debtor." *Id.*, ¶ 24.

The Trustee specifically alleged that one of the creditors of TTV who had a claim was Plaintiff Charles Fryberger, who asserted a claim allegedly valued at $150,000.00 "for breach of contract and copyright infringement."  *Id.*, ¶ 26.  The Trustee asserted five claims for relief: (1) fraudulent avoidable transfer against RME and Streamside, based on transfers that occurred after a judgment in state court, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a); (2) fraudulent transfer against RME and Streamside, based on transfers that occurred after the Fryberger contract, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a); (3) fraudulent transfer against RME, Strimbu and Streamside, allegedly made with the "with the actual intent to hinder, delay, or defraud creditors of the Debtor, including but not limited to VPR and Fryberger"; (4) fraudulent transfers within four years of the petition, asserted against RME, Strimbu and Streamside; and (5) civil conspiracy against RME, Kulin Strimbu and Streamside. *Id.*, ¶¶ 27-66.

### b.    Settlement and Release of Claims Against Strimbu and RME.

The Trustee and adversary proceeding defendants (Ms. Strimbu, RME and Streamside) agreed to settle all claims that the Trustee asserted or arising out of the facts alleged in the adversary proceeding.  [Doc. # 147-3].  In exchange for the defendants' payments, the Trustee provided the following Release to RME, Strimbu and Streamside:

> Upon Bankruptcy Court approval of this Agreement and receipt and negotiation of the Settlement Amount, the Trustee, on behalf of himself, and his heirs, successors and assigns, hereby remises, releases, acquits, and forever discharges Defendants, their attorneys, and theirs heirs, successors and assigns, of and from any and all liability, obligation, claims, actions, causes of action, demands, damages, punitive damages, treble damages, statutory penalties, costs, attorney's fees, and/or expenses whatsoever arising out of or relating to the Adversary Proceeding.

[Doc. # 147-3], p. 2, ¶ 4.

On July 25, 2018, the Trustee moved the bankruptcy court to approve the Settlement Agreement with Strimbu, RME, and Streamside.  [Doc. # 147-4].  Plaintiff's counsel – who had entered in the case – was served with and notified of the Trustee's Motion to Approve Settlement Agreement.  [Doc. # 147-1], p. 6.  Plaintiff had the right to object to the Trustee's Motion to Approve Settlement Agreement, but never did so. *Id.*  On August 17, 2018, the Trustee filed a Certificate of Non-Contested Matter, noting that no creditor or other party filed an objection to the Trustee's Motion to Approve Settlement Agreement.  *Id.*  A week later, on August 21, 2018, the bankruptcy court granted the Trustee's Motion to Approve Settlement Agreement. *Id.*

RME, Strimbu and Streamside fully complied with the Settlement Agreement, which resulted in the bankruptcy estate receiving money that could be distributed to creditors, including Mr. Fryberger.  On April 6, 2020, the Trustee issued the final accounting and distribution report in the bankruptcy matter. *See* [Doc. # 147-1], p. 9.  The bankruptcy court accepted the Trustee's final report and closed the case on May 7, 2020.  *Id.*[2]

### c.   Settlement and Release Is Binding on Plaintiff.

The bankruptcy Trustee had broad statutory powers to pursue claims on behalf of creditors.  *In re MS55, Inc.*, No. CIVA 06-CV-01233-EWN, 2007 WL 2669150, at *12 (D. Colo. Sept. 6, 2007), *aff'd on reh'g,* No. 06-CV-01233-EWN, 2008 WL 2358699 (D. Colo. June 6,

---

[2]      The Court make take judicial notice of these facts evident from the bankruptcy docket at this summary judgment stage.  *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.,* 605 F.2d 1169, 1171-72 (10th Cir.1979) ("[A] district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial.") (citations omitted); *Blixseth v. Credit Suisse AG*, No. 12-CV-00393-PAB-KLM, 2014 WL 4799546, at *5 (D. Colo. Sept. 26, 2014) (court may take judicial notice documents "filed in another court to 'establish the fact of such litigation and related filings,' but '[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b).'") (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir. 1998)).

2008) (citing *Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857, 861 (10th Cir. 1986)).  The Trustee had the exclusive "power to pursue suits regarding damages claims common to all unsecured creditors."  *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 (2d Cir. 1989) and *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987)).  "This special status enables the trustee to achieve an equality of distribution among the corporation's unsecured creditors." *Delgado Oil Co., Inc.,* 785 F.2d at 861.

"[T]he filing of the bankruptcy petition by [the debtor corporation] transmuted the legal rights of its creditors seeking recovery of corporate debts.'" *In re MS55, Inc.*, 2007 WL 2669150, at *12 (quoting *Delgado Oil Co., Inc.,* 785 F.2d at 861).  The Bankruptcy Code prohibited the filing or continuation of lawsuits by an individual creditor against the debtor or against directors of the debtor.  *Id.*  Creditors' general claims were property of the bankruptcy estate.  *See Delgado Oil Co., Inc.,* 785 F.2d at 861; *In re MS55, Inc.*, 2007 WL 2669150, at *12.  Thus, once TTV filed bankruptcy, Fryberger's claims were "maintainable only through the debtor corporation; hence, it is property of the estate." *Delgado Oil Co., Inc.,* 785 F.2d at 861.

A "cause of action that is 'property of the estate' is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors.  This promotes the orderly distribution of assets in bankruptcy, and comports with 'the fundamental bankruptcy policy of equitable distribution to all creditors that should not be undermined by an individual creditor's claim.'" *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (quoting *Koch Refining,* 831 F.2d at 1344).  "[W]here a claim is 'a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim,

and the creditors are bound by the outcome of the trustee's action.'"  *Id.* (quoting *St. Paul Fire & Marine Ins. Co.,* 884 F.2d at 701) (emphasis added).

Here, Plaintiff was a creditor of TTV's bankruptcy estate who had general claims against the estate, including general claims the Trustee asserted in the adversary proceeding against Ms. Strimbu and RME.  Thus, the Settlement Agreement and Release [Doc. # 147-3] binds Fryberger as one of the creditors of TTV's estate on whose behalf the Trustee filed the adversary proceeding.  *Delgado Oil Co., Inc.,* 785 F.2d at 861; *In re Emoral, Inc.*, 740 F.3d at 879; *PepsiCo, Inc.*, 884 F.2d at 702.

> **d.**    **The Settlement Agreement Bars "Any and All Claims" Relating to the Claims in the Adversary Proceeding, Including Plaintiff's Claims Here.**

Here, no dispute exists that the Trustee, Ms. Strimbu and RME voluntarily entered and signed the Settlement Agreement and Release.  [Doc. # 147-3], p. 4.  The terms of the Settlement Agreement and Release are "clear, unambiguous, and capable of enforcement."  *City & Cty. of Denver v. Adolph Coors Co.*, 813 F. Supp. at 1479 (citing *Bonser v. Safeway, Inc.,* 809 F. Supp. 799, 803 (D. Colo. 1992) and *United Mine Workers of America District No. 5 v. Consolidation Coal Co.,* 666 F.2d 806, 810 (10th Cir. 1981)).  The terms must be enforced.  *Id.*; *see also DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1247 (Colo. App. 2001) ("A court may summarily enforce a settlement agreement if it is undisputed that a settlement exists."); *Cary v. Chevron U.S.A., Inc.*, 867 P.2d 117, 119 (Colo. App. 1993) (court must enforce settlement agreement as written "[i]f the language used in a written instrument is plain, clear and no absurdity is involved.").

An enforceable settlement agreement and release may provide a complete defense to claims of copyright or patent infringement.  *See Dinesol Bldg. Prod., Ltd. v. Tapco Int'l, Inc.*, 201 F. App'x 764, 767 (Fed. Cir. 2006); *Remark LLC v. Adell Broad.*, 817 F. Supp. 2d 990, 1005 (E.D. Mich. 2011), *aff'd sub nom. Remark, LLC v. Adell Broad. Corp.*, 702 F.3d 280 (6th Cir. 2012); *see also Thomsen v. Famous Dave's of Am., Inc.*, 640 F. Supp. 2d 1072, 1080 (D. Minn. 2009), *aff'd,* 606 F.3d 905 (8th Cir. 2010) (granting summary judgment to defendant on claims of copyright infringement, inducement to infringe, vicarious infringement, and conspiracy to infringe because of the party's settlement and release agreement).

The plain language of the Settlement Agreement and Release demonstrates that the Trustee broadly released Ms. Strimbu and RME from "any and all liability, obligation, claims, actions, causes of action, demands, damages, punitive damages, treble damages, statutory penalties, costs, attorney's fees, and/or expenses whatsoever arising out of or relating to the Adversary Proceeding."  [Doc. # 147-3], p. 2, ¶ 4.  The release applied to "any and all claims … arising out of or relating to the Adversary Proceeding."  The term "all" "is an unambiguous term and means the whole of, the whole number or sum of, or every member or individual component of, and is synonymous with 'every' and 'each.'"  *Colorado Dep't of Revenue v. Woodmen of the World*, 919 P.2d 806, 814 (Colo. 1996) (quoting *Hudgeons v. Tenneco Oil Co.,* 796 P.2d 21, 23 (Colo. App. 1990)).

The term "related to" also is construed very broadly.  *City & Cty. of Denver v. Dist. Court*, 939 P.2d 1353, 1366 (Colo. 1997); *Austin v. US W., Inc.*, 926 P.2d 181, 183 (Colo. App. 1996) (citations omitted); *Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009) (citations omitted); *see also Smith v. Multi-Fin. Sec. Corp.*, 171

P.3d 1267, 1270 (Colo. App. 2007) ("When an arbitration clause uses the phrase "arising out of" or "relating to," it is broad in scope."); *Digital Landscape Inc. v. Media Kings LLC*, 2018 COA 142, ¶¶ 31-40, 440 P.3d 1200, 1206-06 (use of the phrase "related to" demonstrates intent to broadly apply agreement) (citations omitted).

The Settlement Agreement and Release is binding on Plaintiff, as a creditor of TTV's estate. *In re Emoral, Inc.*, 740 F.3d at 879. It broadly released "any and all" claims relating to "to the Adversary Proceeding." Some of the claims that "related to" the adversary proceeding were Plaintiff's claims that RME engaged in copyright infringement, which is Plaintiff's first claim of relief asserted against RME. *Compare* [Doc. # 1], pp. 7-8, ¶¶ 87-94 (alleging RME have infringed Plaintiff's copyright because RME used Plaintiff's original works without license or authority and that RME "copied the original, expressive elements of CFF's Original Works and distribute[d] them at its website") *with* [Doc. # 147-2], pp. 3-9, ¶¶ 26, 32-33, 40, 47-48, 51, 59, 63 (alleging "a $150,000.00 claim by Charles Fryberger for breach of contract and copyright infringement," and that RME and Ms. Strimbu transferred video, tangible and intangible assets of TTV to herself or RME to hinder, delay or defraud creditors such as Plaintiff). Other claims that "related to" the adversary proceeding were Plaintiff's claims that Ms. Strimbu contributed to TTV's alleged copyright infringement by transferring the content to RME, Apple Vacations and others. *Compare* [Doc. # 1], pp. 8-9, ¶¶ 98-106 (alleging Ms. Strimbu materially contributed to TTV's infringement by transferring videos or content to RME and Apple, or by authorizing use of the videos by RME or Apple) *with* [Doc. # 147-2], pp. 3-9, ¶¶ 32-33, 40, 47-48, 51, 59, 63 (alleging that Ms. Strimbu transferred video, tangible and intangible assets of TTV to herself or RME to hinder, delay or defraud creditors such as Plaintiff). Finally, some claims that "related

to" the adversary proceeding were Plaintiff's claims that Ms. Strimbu authorized RME's use of the video content created by Plaintiff and "received a direct financial benefit from RME's distribution of CFF's Original Works." *Compare* [Doc. # 1], pp. 9-10, ¶¶ 113-119 *with* [Doc. # 147-2], pp. 3-9, ¶¶ 32-33, 40, 47-48, 51, 59, 63 (alleging that Ms. Strimbu transferred video, tangible and intangible assets of TTV to herself or RME to hinder, delay or defraud creditors, such as Plaintiff, for little or no consideration).

The Court should apply the broad terms of the Settlement Agreement and Release and conclude that it bars all of Plaintiff's remaining claims against RME and Ms. Strimbu.  The Court therefore should enter summary judgment in Ms. Strimbu's and RME's favor.  *DeJean v. United Airlines, Inc.*, 839 P.2d 1153, 1161 (Colo. 1992) (agreeing that "summary judgment was appropriate because releases effectively barred claims); *McKissick v. Yuen*, 618 F.3d 1177, 1185 (10th Cir. 2010) (executive's broad release absolving company from "any and all" claims in any form "whatsoever" that she might have had against company precluded executive from pursuing claims in court); *Mata v. Anderson*, 635 F.3d 1250, 1254 (10th Cir. 2011) (affirming summary judgment against plaintiff because the release he agreed to in settlement applied broadly to any and all claims under any other federal, state or local statute, ordinance, or law).

**B.**     **THE COURT SHOULD ENTER SUMMARY JUDGMENT IN RME'S FAVOR ON PLAINTIFF'S CLAIM 1 (COPYRIGHT INFRINGEMENT), CLAIM 2 (CONTRIBUTORY COPYRIGHT INFRINGEMENT), AND CLAIM 3 (VICARIOUS COPYRIGHT INFRINGEMENT) BECAUSE TTV RETAINED COPYRIGHT OWNERSHIP.**

**1.     Burden of Proof and Elements on Plaintiff's Claims.**

Plaintiff's first claim asserts copyright infringement.  [Doc. # 1], pp. 7-8, ¶¶ 84-94.  "To establish copyright infringement plaintiff must prove (1) ownership of a valid copyright and (2) 'copying of constituent elements of the work that are original.'"  *TransWestern Pub. Co. LP v.*

*Multimedia Mktg. Assocs., Inc.,* 133 F.3d 773, 775 (10th Cir. 1998) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)).  Plaintiff bears the burden of proof on each element.  *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) (citing *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005)).

Plaintiff's second claim asserts a claim for contributory copyright infringement against Ms. Strimbu.  [Doc. # 1], pp. 8-9, ¶¶ 95-110.  "Contributory copyright infringement is derivative of direct copyright infringement."  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1146 (10th Cir. 2016).  To establish a claim for contributory copyright infringement, Plaintiff must first establish direct infringement on Claim One, and then also establish: (1) Ms. Strimbu knew or had reason to know of the infringing activity; (2) Ms. Strimbu intentionally induced and materially contributed to the infringing activity.  *La Resolana Architects, PA*, 555 F.3d at 1181 (citing *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930–31, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)).  Plaintiff bears the burden of proof on each element of his contributory copyright infringement claim.  *Savant Homes, Inc.*, 809 F.3d at 1146.

Plaintiff's third claim asserts a claim for vicarious copyright infringement against Ms. Strimbu.  [Doc. # 1], pp. 9-10 ¶¶ 111-121.  To establish a claim for vicarious copyright infringement, Plaintiff also must first establish direct infringement on Claim One, and then also establish: (1) Ms. Strimbu "'enjoyed a direct financial benefit from *another's* infringing activity;'" and (2) Ms. Strimbu had "'the right and ability to supervise the infringing activity.'" *La Resolana Architects, PA*, 555 F.3d at 1181 (quoting *Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004)).  Plaintiff bears the burden of proving each element.  *Id.*

For all three claims, proof of a direct copyright infringement is required. *Id.* (citing *Bridgeport Music, Inc. v. Diamond Time, Ltd.,* 371 F.3d 883, 889 (6th Cir. 2004)).

2. **The Court Should Enter Summary Judgment Because the Undisputed Facts Show TTV Owned the Original Works to Which Plaintiff Claims Copyright Protection.**

The Court should enter summary judgment in RME's favor on Plaintiff's first claim, and in Ms. Strimbu's favor on Plaintiff's second and third claim, because Plaintiff cannot prove the first required element for copyright infringement – ownership of a valid copyright. *TransWestern Pub. Co. LP,* 133 F.3d at 775; *La Resolana Architects, PA*, 555 F.3d at 1181.

On July 17, 2012, Plaintiff and TTV entered into a Service Contract, which called for Plaintiff to provide production work on certain videos. *See Exh. A; see also* Deposition of Charles Fryberger (attached as *Exh. B*), pp. 64:1-65:23 (confirming the July 17, 2012 agreement was the first formal agreement Plaintiff had with TTV). On September 4, 2012, TTV entered into a Master Service Agreement with Plaintiff ("MSA") to provide production work on certain videos. *See Exh. C; see also Exh. B*, pp. 137:21-138:1 (confirming Plaintiff and TTV entered the Master Service Agreement).

In the Sept 4, 2012 MSA, Plaintiff and TTV agreed that:

[A]ll proprietary information disclosed by TTY to CFF relating to TTV's business and the business of its subsidiaries and affiliates, including business models, market strategies, production processes, trade secrets, know-how, patents, copyrights, financial information, sales, distribution strategies, internet and eCommerce strategies, devices, records. Data, notes, reports, proposals, lists, correspondence, designs, formulas, developmental or experimental work, computer programs, data bases, customer lists, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, will be referred to collectively in this Agreement as "Confidential Information."

*Exh. C*, p. 4. Plaintiff further agreed that all of this "Confidential Information, and any derivative thereof remains the property of TTV, and no license, intellectual property rights or other rights to the Confidential Information are granted or implied hereby other than the limited right to use for the Purpose." *Id.*, p. 5. For copyrightable or copyrighted material, the MSA defined derivatives to mean "any translation, abridgement, revision or other form in which an existing work may be recast, transformed or adapted." *Id.*

The MSA's terms are unambiguous and must be applied against Plaintiff, who indisputably agreed to them. The MSA's terms establish that TTV retained copyright ownership of the videos Fryberger filmed or produced. Further, the MSA did not contain any exception that would allow Plaintiff to own the copyrights to the videos he created or helped to create if TTV failed to pay. *Exh. C.* To the contrary, the MSA had a provision regarding the effect of terminating the agreement, which required only payment obligations. *Id.*, p. 4. Plaintiff still was required to transfer immediately to TTV "any and all video content files, finishes or unfinished, graphic files, and partially finished project work." *Id.* The MSA further provided that Plaintiff could not "withhold any "video, graphic, or content files owned or applied to TTV work" for any reason. *Id.* This language did not contain any exceptions that would allow Plaintiff to claim copyright ownership in the event of non-payment by TTV. *Id.*

Plaintiff likely will argue that his act of capturing and editing the video footage into what became the final videos automatically made him owner of the copyrights in the videos, pursuant to 17 U.S.C. § 201(a). Even assuming Plaintiff's argument had factual merit and that he was presumptively the owner of the copyrights in the videos under 17 U.S.C. § 201(a), the MSA's terms transferred ownership of the copyrights to TTV, pursuant to 17 U.S.C. § 204(a). "Despite

14

the clear mandate that a valid transfer of copyright ownership be in writing, the Act does not spell out the requirements of such a writing." *Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 356 F. Supp. 2d 515, 522 (E.D. Pa. 2005), *aff'd,* 184 F. App'x 270 (3d Cir. 2006). Generally state, "[n]o magic words must be included in a document to satisfy § 204(a)." *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999). "Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." *Id.*

Here, the MSA's terms manifest Plaintiff's and TTV's intent that any copyright Plaintiff may have had to the video content would be transferred to TTV. *Exh. C*, p. 4 (providing that "[a]t no time, and for no reason, will [Plaintiff] withhold any video, graphic, or content files owned or applied to TTV work"); *Id.* (providing that TTV would own all confidential information); *Id.*, p. 5 (all confidential information, copyrights and an derivative work created by Plaintiff "remains the property of TTV" and no "no license, intellectual property rights or other rights to the Confidential Information are granted or implied hereby other than the limited right to use for the Purpose."). Accordingly, the MSA is sufficient under 17 U.S.C. § 204(a), which defeats Plaintiff's claim of copyright ownership. *Scharle*, 356 F. Supp. 2d at 523.2

Based on the unambiguous terms of the MSA, the Court should find that Plaintiff cannot establish ownership of a valid copyright. Thus, Plaintiff's copyright claims fail. *TransWestern Pub. Co. LP,* 133 F.3d at 775; *La Resolana Architects, PA*, 555 F.3d at 1181.

C.   **THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR COPYRIGHT INFRINGEMENT, CONTRIBUTORY COPYRIGHT INFRINGEMENT AND VICARIOUS COPYRIGHT INFRINGEMENT BECAUSE RME AND MS. STRIMBU HAD AN IMPLIED LICENSE THAT WAS NOT REVOKED.**

1.   **Burden of Proof and Elements on Defendants' License Affirmative Defense.**

License is an affirmative defense to copyright infringement.  *See Wilson v. Brennan*, 666 F. Supp. 2d 1242, 1260 (D.N.M. 2009), *aff'd,* 390 F. App'x 780 (10th Cir. 2010).  Ms. Strimbu and RME alleged license as an affirmative defense in their Answer.  [Doc. # 33], p. 10, ¶ 13.

To prevail on its affirmative defense, these defendants bear only the burden of proving the existence of a license granted to it.  *See Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996).  Plaintiff then bears the burden of proving that these defendant's use of the copyrighted work exceeded the scope of the license.  *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) (citing *I.A.E., Inc*, 74 F.3d at 775); *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).

The existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement.  *Boatman v. United States Racquetball Assoc.*, 33 F.Supp.3d 1264 (D. Colo. 2014).  Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.  *Jacobsen v. Katzer*, 535 F.3 1373, 1380 (Fed. Cir. 2008).

While the Copyright Act requires that exclusive licenses be evidenced by a writing, no such requirement exists as to nonexclusive licenses.  Section 101 of the Act defines "Transfer of Copyright Ownership" to include exclusive licenses, but expressly excludes nonexclusive licenses.  17 U.S.C. § 101 (2012).  As such, under federal law a nonexclusive license may be

granted orally, or may be implied from conduct.  *See Effects Associates, Inc.* 908 F.2d at 558;
*Shaver,* 74 F.3d at 775.

A non-exclusive license is implied from conduct where: (1) a person requests the creation
of a work; (2) the particular work is made and delivered to the person who requested it; and (3)
the licensor intends that the licensee copy and distribute the work in accordance with its intended
use.  *Shaver*, 74 F.3d at 776.  When these factors are satisfied, there exists an implied non-
exclusive license permitting the licensee to engage in use even if the contract does not expressly
grant such a license.  *See Atkins v. Fischer*, 331 F.3d 988, 991-992 (D.C. Cir. 2003); *Smith Kline
Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000).

In *Effects Assoc., Inc. v. Cohen*, the court held that the plaintiff, a special effects company
which had created and delivered video footage at the request of the defendant film maker, had
impliedly granted nonexclusive licenses to the film maker to incorporate special effects footage
into the movie and to an entertainment company to distribute the movie.  908 F.2d at 559.  The
court held that because the plaintiff created and handed over work that defendants requested, and
because the plaintiff intended that defendants copy and distribute it, an implied license existed
such that the defendants did not infringe on the plaintiff's copyright.  *Id.*  The court concluded
that the plaintiff impliedly granted the nonexclusive license to the defendants to incorporate the
special effects footage into the defendants' movie.  *Id.*

Likewise, in *Wilchombe v. TEE VEE Tunes, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009), a
musician brought a copyright infringement action against a record company, recording artist, and
other defendants.  The court upheld the district court's ruling that the parties' conduct created an
implied license.  The court found that the plaintiff created the work at the defendants' request

and delivered it to the defendants, intending that the defendant copy and distribute it.  *Id*.  As such, the court found that an implied nonexclusive license existed such that Plaintiff's copyright infringement action failed.  *Id.*

> **2.**   **The Court Should Enter Summary Judgment on TTV Defendants' Affirmative Defense of License Because the Undisputed Facts Show That Plaintiff Granted the TTV Defendants an Implied Nonexclusive License to Use the Copyrighted Material.**

Even assuming *arguendo* Plaintiff could establish that he owns a valid copyright to the video content in question and that RME and Ms. Strimbu reproduced and distributed the Plaintiff's in the ways described in Plaintiff's Complaint, the Court should enter summary judgment in Ms. Strimbu's and RME's favor based on their affirmative defense of implied license.  The undisputed facts show that Plaintiff gave the Defendants an implied license to distribute any content Plaintiff created, which precludes liability on Plaintiff's copyright claims (Claims One through Three).

> **a.**   **Defendant Requested the Creation of the Work.**

As evidenced by the Plaintiff's deposition (*Exh. B*), along with the written agreements between the parties – the Service Contract entered into by the parties on July 17, 2012 (*Exh. A*) and the MSA entered into by the parties on September 4, 2012 (*Exh. C*) – TTV requested the Plaintiff produce the material at issue in this case.

The parties' July 17, 2012 Service Contract states that "client wishes to have Service provider provide services for compensation," and that the "Service Provider agrees to produce, edit, and/or direct video productions, on behalf of Client."  *Exh. A*, at 1.  Although the July 17, 2012 Service Contract was superseded by the subsequent September 4, 2012 MSA, the MSA also contained language evidencing Defendant's request that Plaintiff produce the material.  *Exh.*

*C*, p. 1.  The MSA states the parties' intention in the recital portion of the contract, stating the following in pertinent part:

> **WHEREAS** the parties wish to enter into a business relationship wherein [TripTelevision ("TTV")] wishes to receive pre-production, production, and post-production services and [Chuck Fryberger Films ("CFF")] wishes to provide such pre-production, production, and post-production services to TripTelevision (the "Purpose").

*Id.*

The licensee's request that the licensor create a work need not be in writing, although, as is the case here, it may be embodied in a written agreement.  *See Shaver*, 74 F.3d at 770.  Here, the parties clearly stated their intention that Plaintiff create video content for TTV, which also included Ms. Strimbu.  *Exh. C*, p. 6.  The first element of an implied license is satisfied.

### b.     Plaintiff Produced the Videos and Delivered Them to TTV.

After filming and producing the requested videos, Plaintiff uploaded the finished product to a hosting system called Brightcove.  *Exh. B*, p. 124:12-15.  Once the content was uploaded to Brightcove, it was accessible to the end user.  *Id.*, pg. 125:1-5.  Brightcove was the tool the parties used to hand off the video to the Defendants.  *Id.*, p. 124:23-25.  Plaintiff considered the content it delivered and finished once it was uploaded to Brightcove.  *Id.*, p. 125:1-5.

The MSA contained provisions regarding Plaintiff's duty to continually deliver content to TTV during the course of the agreement, including termination for breach.  *Exh A*, p. 3.  The MSA provides the following in pertinent part:

> TTV agrees to provide CFF with a hard drive every two (2) weeks.  CFF agrees to copy all pre-production, production, and post-production video, including video content files, finishes [sic] or unfinished, graphic files, and partially finished project work (the "Content") from the previous two (2) weeks onto the hard drive provided by TTV.  CFF agrees to provide TTV with twice-monthly data backups on a provided hard drive, for transportation and storage at an off-site facility of

> their choosing.  TTV will withhold payment if content is not transferred within
> seven (7) days after the hard drive has been delivered unless otherwise agreed
> upon by both parties.

*Id.*  Additionally, under the MSA, Plaintiff was required to deliver all remaining undelivered

content upon termination of the agreement.  Plaintiff agreed not to withhold any of the content at

any time or for any reason.  *Id.*, p. 4.  Because the Plaintiff delivered all content to TTV and its

agents, the second element required for finding an implied license is satisfied.

### c.     The Undisputed Evidence Demonstrates that Plaintiff Understood and Intended the TTV Defendants Would Copy and Distribute the Videos in Accordance with Its Intended Use.

The copyright owner's intent is the touchstone for determining whether such an implied

license has been granted.  *Nelson–Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516

(4th Cir. 2002).  Courts look to a number of factors when determining the parties intention,

including "'(1) whether the parties were engaged in a short-term discrete transaction as opposed

to an ongoing relationship; (2) whether the creator utilized written contracts ... providing that

copyrighted materials could only be used with the creator's future involvement or express

permission; and (3) whether the creator's conduct during the creation or delivery of the

copyrighted material indicated that use of the material without the creator's involvement or

consent was permissible.'"  *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d

26, 41 (1st Cir. 2003) (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505,

516 (4th Cir. 2002)).  The court must ask whether "the totality of the parties' conduct indicates

an intent to grant such permission [for an implied license]."  *Estate of Portrio Corp.*, 602 F.3d

34, 41 (1st Cir. 2010) (quoting *Nimmer on Copyright* § 10.03[A][7] at 10-42 (2000)).  Courts

also look at objective factors, including "deposition testimony and whether the copyrighted

material was delivered 'without warning that its further use would constitute copyright infringement.'" *Wilchombe*, 555 F.3d at 956 (quoting *Shaver*, 74 F.3d at 776); *see also Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) ("Courts focus on objective evidence revealing the intent of parties to determine if an implied license exists, and this inquiry also reveal the scope of that license.").

Courts have found implied copyright licenses in instances where no written materials required the creator's express permission to use the materials, and where the creator's conduct lacked a warning that the licensee's use of that material would be impermissible. *See Wilchombe*, 555 F.3d at 956; *Effects*, 908 F.2d at 559, n. 6.

Here, Plaintiff delivered the materials to the Defendants with the knowledge that the materials would be copied and distributed to TTV's clients/end users. *See Exh. A,* pp. 1-2, ¶¶ 1.1-1.5; *Exh. C*, p. 3 ("provided content"). Plaintiff clearly understood and intended the content to be used as promotional material for Apple Vacations and others. Plaintiff testified "[w]e understood that since they were commercials for Apple Vacations, it goes without saying that we understood that they would be most likely used by Apple Vacations to promote their resorts." *Exh. B*, pp. 125:22–126:4. Plaintiff estimated that Plaintiff affixed Apple Vacation's logo onto "90 percent or more of the videos that went out the door." *Id.*, p. 128:3-5, 147:23-25 & 300:5-7. Plaintiff uploaded the videos to Brightcove with the understanding that it would then be accessible to the "end-user." *Id.*, p. 125:1-5.

Additionally, the parties were engaged in a short-term discrete transaction. The term of the agreement was 6 months. *Exh. C*, p. 1. Although TTV was one of Plaintiff's major clients,

Plaintiff serviced other clients as well.  TripTelevision made up for only about 40% to 60% of the Plaintiff's monthly billings.  *Exh. B*, p. 122:17-18.

As to the second *Nelson-Salabes* factor, there is no evidence of any agreement, written or otherwise, that limited the use of the videos to instances in which Plaintiff either gave express permission or remained personally involved in the work.  Even though a written agreement between the parties existed, it was silent on those salient points.  Additionally, there is no indication that Plaintiff ever warned the TTV Defendants that further use of the videos would constitute copyright infringement; nor that Plaintiff ever required TTV Defendants obtain additional permission to use or distribute the videos.

The terms of the MSA specifically contemplated that the content would be shared by the Plaintiff to an "end-user."  The MSA defined Finished Production Work as video which his "satisfactory and approved by TTV and the end user/customer."  *Exh. C,* p. 2.  Plaintiff testified that he knew that at least one of the end users was going to be Apple Vacations.  *Exh. B*, pp. 125:22– 126:4.

Even when the MSA would be terminated, Plaintiff did not state that the TTV Defendants must obtain permission to make further use of the material.  Plaintiff's March 22, 2013 email terminating the agreement is silent on this point.  *Exh. D.*  In fact, after termination, Plaintiff allowed the Defendant into his facility and, at Plaintiff's own direction, allowed him access to his servers in order to copy the remaining material onto a hard drive, notwithstanding that there was an ongoing payment dispute.  *Exh. B,* pp. 343:18 – 347:13.  The parties clearly contemplated this in the "effect of termination" clause in the MSA.  *Exh. C*, p. 4.

      **d.**     **The Undisputed Facts Establish that the Defendants Had an Implied Nonexclusive License to Use the Content.**

Based on the foregoing, it is clear from the parties' conduct that the Plaintiff granted the TTV Defendants an implied nonexclusive license to use the copyrighted material.

    **3.**     **Plaintiff Cannot Establish that the TTV Defendants' Use of the Material Exceeded the Scope of the Implied License.**

The TTV Defendants have met their burden of proving the existence of an implied license.  As such, the burden shifts to Plaintiff to prove that the TTV Defendants exceeded the scope of the license.  *See Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) (citing *I.a.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)); *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).

To determine the scope of an implied license, courts focus on objective evidence revealing the parties' intent.  *Latimer*, 601 F.3d 1224.  In order to restrict the scope of a license, the copyright owner must express such an intent when they deliver the copyrighted work. *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008). "An implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered." *Latimer*, 601 F.3d at 1235.

Here, Plaintiff cannot demonstrate a triable issue of fact showing that the TTV Defendants exceeded the scope of the implied license.  Rather, the objective evidence shows that the parties intended the scope of the license to include distribution to and use by third-parties for promotional purposes.  And there was no temporal limitation on the scope of the license.

Plaintiff was aware that TTV was distributing the produced videos to third-parties and consented to the content being used in such a way.  There is no evidence that Plaintiff ever attempted to restrict the use of the videos or otherwise prevent the TTV Defendants from using the videos.  Instead, Plaintiff consented to the material being distributed to and used by the Defendants' clients/end-users.  *Exh. B*, p. 125:1-5; *Exh. C*, p. 3.  Plaintiff understood when he uploaded the material to Brightcove that the videos would become accessible to the TTV Defendants' clients/end-users and that such end-users were to use the videos for promotional purposes.  *Exh. B*, p. 124:12 – 125:5.  Knowing all this, Plaintiff continued to produce and deliver content, even after the payment dispute arose, and did not object or otherwise attempt to place limitations on the use of the videos. *See Exh. D*; *Exh. B,* pp. 343:18 – 347:13.

Finally, the MSA includes obligations after termination of the agreement.  *Exh. C*, pp. 3-4.  The MSA provides for delivery of the remaining content to TTV upon termination of the agreement, evidencing that the parties intended the TTV Defendants to make use of the material even after termination of the agreement.  *Id.*, p. 4.  Plaintiff's March 22, 2013 email to Ms. Strimbu and others, in which he advised the TTV Defendants of his intent to terminate the agreement, included directions to transfer the remaining data from the Plaintiff's system to the TTV Defendants.  *Exh. D.*

The parties' intent here is clear – the scope of the implied license extended to distribution to and use by the TTV Defendants' "end-users" and survived termination of the agreement.  The TTV Defendants used the videos in this exact manner and, as such, did not exceed the scope of the implied license.  Plaintiff cannot meet his burden of proving that the TTV Defendants

exceeded the scope of the implied nonexclusive license.  The Court therefore should enter summary judgment in TTV Defendants' favor on their affirmative defense of implied license.

### 4.   The Implied License is Irrevocable and TTV's Failure to Make Full Payment Does Not Affect the Conveyance of the Implied License.

The TTV Defendants anticipate that Plaintiff will raise the argument that TTV's failure to make full payment under the MSA's terms operates as a revocation of the implied license.  Such an argument is without merit.

TTV has admitted it failed to pay a portion of the Plaintiff's bill for services under the MSA.  That is partly the reason TTV filed bankruptcy.  But any failure to pay Plaintiff under the MSA has no impact on the grant or scope of the license, implied by the conduct of the parties.  Nor does a failure to pay revoke such license.  The written agreement between the parties (the MSA) is separate and apart from the granting of the license, which is implied by the parties' conduct, such that the failure to perform under the MSA does not affect the rights granted by the implied license.  Furthermore, because TTV paid consideration to Plaintiff under the MSA, the license is irrevocable.  *See Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008) (citing *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.,* 128 F.3d 872, 882 (5th Cir. 1997) and 3-10 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[B][5] (2008)); *Xtomic, LLC v. Active Release Techniques, LLC,* 460 F. Supp. 3d 1147, 1155 (D. Colo. 2020) (finding licenses irrevocable, "i.e., they are granted in perpetuity," because defendants paid consideration for them) (citing *Gagnon*, 542 F.3d at 757).

In *Effects v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990), the Court refused to construe payment in full as a condition precedent to implying a license.  *Id.*, p. 558 n. 7.  Instead, the court in *Effects* held that, absent an agreement to the contrary, full payment as a condition precedent to

the Defendant's use of the material would not be read into the party's agreement.  *Id*.  The court ruled that a license was conveyed despite less-than-full payment was made for the work.  *Id*.  The parties' oral agreement, according to the court, did not supersede or preclude the implied license created by the parties' conduct because the oral agreement did not address copyright or licensing in any way.  *See Effects*, 980 F.2d at 559.

Likewise, in *Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-CV-01118-KLM, 2015 WL 1816479, at * 9 (D. Colo. 2015), the court refused to reverse an implied nonexclusive license due to the Defendant's failure to pay.  In *Millennium*, Plaintiff agreed to produce a video advertisement for Defendant's car dealership.  *Id*., at * 1.  The ad was delivered by the Plaintiff to Comcast and was subsequently broadcast on Comcast's television channels.  *Id*.  Defendant failed to pay Plaintiff for the advertisement and Plaintiff filed suit alleging copyright infringement.  *Id.,* at * 2.  The Court held that an implied nonexclusive license existed, and that such license was not invalidated by the Defendant's failure to pay for the advertisement.  *Id.,* at * 9.  According to the court, an implied license existed by virtue of the parties' conduct; not a written or oral agreement.  Because it was the parties' conduct that created the implied license, the requirement to pay for the content, which was expressed in the parties' oral agreement, was separate and distinct from the existence of the implied license.  *Id*.  As such, the oral agreement between the defendant and did not supersede or preclude the implied license created by the parties' conduct.  *Id*. (*citing Effects*, 980 F.2d at 556).

The only difference between *Millennium*, *Effects* and the instant case is that the agreement to pay was written rather than oral.  Just as in *Effects* and *Millennium,* a license to use the content was implied from the parties' conduct.  The agreement between the parties to pay

(the MSA) and the license to use the conduct (implied by the parties' conduct) are separate and distinct from each other, and must be treated as such.  Under *Effects* and *Millennium*, the failure by one party to perform under the MSA does not affect the rights granted by the implied license.  Transfer of the license and use of the material were not conditioned upon payment for the material and transferred to the Defendants despite less than full payment by the Defendant.

As such, Plaintiff's only recourse for the Defendants' failure to pay is in breach of contract, not copyright.  *See Effects*, 908 F.2d 555 (*stating* "Copyright ownership is comprised of a bundle of rights; in granting a nonexclusive license … [copyright owner] has given up only one stick from that bundle … it retains the right to sue [licensee] in state court on a variety of other grounds, including breach of contract").  But Plaintiff's contract claim is directed only against TTV and TTV filed bankruptcy, precluding any relief on such a claim.

As noted above, the MSA expressly discusses immediate delivery of the content, even if the agreement is terminated for nonpayment.  *Exh. C*, p. 4.  On numerous occasions during the parties' relationship, the Plaintiff knew of and consented to the TTV Defendants' use of the video without payment.  The MSA provided for billing in arrears and specifically contemplated using the material even before payment.  *Id.*, p. 2.

Plaintiff admitted in his deposition that work was delivered prior to payment in full for the work.  *Exh. B*, p. 338:3-24.  Plaintiff's practices were such that work performed during the course of a calendar month would not be billed until the last day of that month.  TTV was then given an additional 30 days from the billing date to pay the invoice.  *Id.*, pp. 317:14 –318:3.

Additionally, the license impliedly granted to the Defendants by the Plaintiff was irrevocable because it was supported by consideration.   In the context of copyright, a license

granted for consideration is irrevocable.  *Lulirama Ltd.*, *Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872 (5th Cir. 1997).  A nonexclusive license may be irrevocable where supported by consideration.  *Karlson v. Red Door Homes, LLC*, 18 F.Supp.3d 1301 (N.D. Alabama, 2014).

The Plaintiff in *Lulirama*, an independent contractor who prepared advertising jingles, sued the Defendants after they failed to pay for the jingles under the terms of the parties' agreement.  The court found the existence of an implied nonexclusive license and held that the plaintiff did not revoke the license merely by filing a lawsuit.  *Id.*, at 882.  Under the court's reasoning, if *Lulirama* had the ability to terminate the license at will, then no contract existed because *Lulirama's* obligation under the contract would be illusory.  *Id.*, at 882-3.  The court found no indication that the parties intended that buyer's right to use the jingles would be terminable at the will of the contractor.  As such, the license was irrevocable.  *Id.*, at 883; *see also Geffert Co. v. William J. Hirten Co., LLC*, 815 F. Supp. 2d 521 (D. Rhode Island, 2011) (if an implied license, supported by consideration, were revocable, such license would be illusory); *Carson v. Dynegy, Inc.*, 344 F.3d 446 (5th Cir. 2003) (whether an implied license is irrevocable rests solely with whether the [licensor] receives consideration).

Here, there is no indication that the parties intended the license to become irrevocable upon Defendant's failure to pay.  Plaintiff was paid considerably more than what the original contract intended.  Even though the entirety of the Plaintiff's fee was not paid, this fact cannot support the conclusion that the license is revocable.  As noted above, Plaintiff is free to seek recovery under other theories of liability, including breach of contract.  By granting Defendants a license, however, he has surrendered his right to bring a claim for copyright infringement.

### III.   <u>CONCLUSION</u>.

The Court should enter summary judgment in TTV Defendants' favor because the Settlement Agreement and Release in TripTelevision's ("TTV's") bankruptcy is binding on Plaintiff and released all claims here.  Further, the Court should enter summary judgment on Plaintiff's copyright claims (Claims One through Three) because TTV owns all copyrights under the MSA.  Finally, the Court should enter summary judgment because the undisputed evidence shows the TTV Defendants had an irrevocable nonexclusive license to use the videos, which defeats Plaintiff's copyright claims.

DATED:  February 22, 2020.

*s/ Troy R. Rackham*
Troy R. Rackham
SPENCER FANE, LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
trackham@spencerfane.com

*Attorney for Defendants Kulin Strimbu and*
*Rich Media Exchange, LLC*

## CERTIFICATE OF SERVICE

   I hereby certify that on February 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas P. Howard
Scott E. Brenner
William C. Groh
Thomas P. Howard, LLC
842 W South Boulder Rd., #200
Louisville, CO 80027
*Attorneys for Plaintiff*

Andrew D. Ringel
Conor Boyle
Hall & Evans, LLC
1001 17th Street, Suite 300
Denver, CO 80202

*Attorneys for Apple Vacations, LLC*

            s/ *Troy R. Rackham*