UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Case No.: 1:15-cv-00363-MSK-STV

CHARLES F. FRYBERGER d/b/a CHUCK FRYBERGER FILMS,
      Plaintiff,
v.

TRIPTELEVISION, LLC, a Nevada company,
KULIN STRIMBU, an individual,
RICH MEDIA EXCHANGE, LLC, a Colorado company,
APPLE VACATIONS, LLC, a Delaware Corporation,
      Defendants.

---

Plaintiff's Motion for Summary Judgment

---

COMES NOW Plaintiff Charles F. Fryberger, who moves for summary judgment on his First Claim against Rich Media Exchange ("RME") for copyright infringement and his Second and Third Claims against Kulin Strimbu for contributory and vicarious copyright infringement, respectively. This motion made under Fed. R. Civ. P. 56.

## A. Introduction

This action concerns Defendants' unauthorized use of Plaintiff Charles F. Fryberger's copyrighted works (the "Works"). The Works include 200 videos shot, edited, or shot and edited by Fryberger's full-time employees within the scope of their employment. The Works do not include the approximately 60 videos that Defendant Trip Television, LLC ("TTV") paid for.

Fryberger's claims against TTV and Apple Vacations have been resolved. On November 16, 2015, TTV filed for bankruptcy protection. *See* (Doc. #37). On April 6, 2020, the trustee in TTV's bankruptcy issued the final account and distribution report, ending TTV's bankruptcy and discharging Fryberger claims against TTV. (Doc. # 146-1). In 2019, Defendant Apple Vacations agreed to settle Fryberger's claims against it.

**B.  Background**

In 2011, Defendant TTV secured a lucrative contract from Apple Vacations to produce

and host[1] promotional videos intended to increase Apple Vacations' sales of vacation travel.

Ex. A (Doc. #105).[2] Under the contract, Apple Vacations prepaid TTV for the creation and

hosting of videos. Ex. A, B, B-1; Ex. T 151:9-12 (Strimbu Dep. Aug. 11, 2016). Between 2011

and early 2014, TTV earned more than $750,000 from Apple Vacations for delivering and

streaming/hosting promotional travel videos, including the Works. Ex. C.

Initially, TTV used contract workers and an outside post-production firm named

Crosspoint (a/k/a Blue Onion) to produce the promotional videos. Ex. V 26:22-27:8 (Owen

Dep.); Ex. W 120:9-16 (Baumberger Dep. July 29, 2016). After TTV had failed to pay

Crosspoint, Crosspoint stopped work on the videos and withheld the video files from TTV.

Ex. W 120:9-16, 123:15-20; 125:21-125:16.

**1.   TTV hired Fryberger as an independent contractor.**

After destroying its relationship with Crosspoint, TTV hired Fryberger to create

promotional videos, specifically videos promoting travel to Jamaica. (Doc. #1-1); Ex. W 120:14-

16; Ex. U ¶3 (Fryberger Dec.). In July 2012, TTV drafted an agreement to memorialize its

relationship with Fryberger (the "Jamaica Agreement."). (Doc. #1-1); Ex. U ¶3. The Jamaica

Agreement includes a Copyrights section that expressly states, "[Fryberger] agrees to irrevocably

assign and convey to [TTV] all rights, title, and interest in the same, to all captured images of the

property or product-based content captured in both raw and edited formats." (Doc. #1-1 ¶3.3,

emphasis added).

---

[1] Initially, TTV hosted the videos, then RME provided hosting. Ex. A; Ex. T 150:25-151:19; Ex. D.

[2] Exhibits A, B, B-1, D, K, and L were filed under Level 1 Restriction (#105). The Docket Entry Number for the sealed version is listed in parenthesis next to citations to these exhibits.

In August 2013, Fryberger and TTV renegotiated their relationship. The new relationship was memorialized in a new agreement drafted by TTV titled the Master Service Agreement ("MSA"). (Doc. #1-2); Ex. U ¶4. The MSA expressly "supersedes all previous Agreements," including the Jamaica Agreement. (Doc. #1-2 at 7). The MSA does not purport to transfer any copyrights to TTV. (Doc. #1-2). Nor does it create a work-made-for-hire relationship. *Id*.

Fryberger hired full-time employees to create promotional videos for the travel industry (the Works). Ex. X (Fryberger Dep.) ¶4. Unlike TTV, Fryberger required his employees to execute work-made-for-hire agreements, stating that all creative work made within the scope of employment belongs to Fryberger. Ex. X 61:8-13; *See* Ex. E.

The MSA required TTV to pay Fryberger a monthly retainer, pay daily fees for video production, pay per/minute fees for "finished videos," and reimburse Fryberger for all travel-related expenses. (Doc. #1-2 at 1-2). "Finished videos" is the term TTV and Fryberger used to identify videos that were finished, *i.e.*, shot and edited, including soundtracks, title graphics, and color correction.

The MSA was effective from August 15, 2012, through March 2013.[3] *Id*. Ex. U ¶7. During this time, Fryberger delivered hundreds of finished videos to TTV. Ex. U ¶5; (Doc. #1-9). Fryberger delivered the finished videos to TTV through a file-sharing service selected by TTV. Ex. V 78:2-23; Ex. W 50:11-51:11, 294:4-7. Fryberger identified each individual video by name as a line item on his invoices to TTV. (Doc # 1-9). Each video was subject to an implied license to TTV, allowing TTV to use the video for its intended purpose, namely promoting Apple Vacation's travel services. During this time, Fryberger never delivered raw footage to

---

[3] The MSA automatically renewed for an additional 12 months in February 2013. (1-2 at 2). Ex. U ¶7.

TTV, nor did it deliver work-in-progress.[4] Ex. U ¶5. At no time did TTV or Apple Vacations complain about the quality of Fryberger's Work. Ex. U ¶10; Ex. T 133:18-134:5; Ex. B-1 (Doc #105-2). Nor did TTV dispute the accuracy of any of Fryberger's invoices. Ex. U ¶10; Ex. T 63:4-10.

### 2.   TTV stopped paying Fryberger for the videos he was delivering.

Beginning at least as early as December 30, 2013, TTV fell behind in paying Fryberger. Ex. U ¶7; Ex. F. TTV repeatedly indicated that it would catch up and continued to make small payments towards its outstanding invoices. Ex. U ¶7; Ex. F. TTV told Fryberger that he would have to continue to produce videos so that TTV could bill Apple Vacation and then use that money to pay Fryberger. Ex. X 358:5-18. By March 2013, TTV was past due on three invoices totaling nearly $90,000. Ex. U ¶9; Ex. F. By this time, Fryberger could no longer afford to do business with TTV. Fryberger properly terminated the MSA effective March 29, 2013. (Doc. #1-2 at 5); Ex. U ¶9. Pursuant to the termination clause, he allowed TTV to copy his raw footage and work-in-progress. Ex. U ¶9; Ex. X 343:18-25. He did *not* transfer or assign his copyrights in the Works to TTV or anyone else. Ex. U ¶9. Nor did he intend to extend TTV's license to use the raw footage or work-in-progress. *Id*. His sole purpose in turning over the raw footage and work-in-progress was to satisfy his obligations under the MSA. *Id*.; Ex. X 347:8-13.

By the time Fryberger terminated the MSA, he had delivered to TTV more than 200 videos which TTV had not paid for—the Works. (Doc. #1-9); Ex. F. Within a week of termination, TTV affirmed Fryberger's invoices, ratified the outstanding invoices, and agreed to pay 6.5% interest on them. (Doc. #1-5 at 3). At this point, Fryberger believed that TTV would

---

[4] Fryberger provided TTV with low resolution rough cuts of the videos for TTV and Apple Vacations' review and approval. These rough cuts could not be edited, did not include graphics, and had uncorrected color. Ex. U ¶5 .

pay their bills, and TTV and Fryberger would resume working with TTV. Ex. U ¶9. During this period, the TTV discussed with Fryberger the possibility of buying out Fryberger's business in order to gain control of Fryberger's copyrights and resolving TTV's debts. Ex. T 203:3-10; 203:23-204:2; Ex. G; Ex. X ¶7.

Although TTV was already 90 days past due on the November 2012 invoice, the MSA termination clause allowed TTV an additional 90 days from the date of termination to pay all outstanding invoices. (Doc. #1-2 at 5). By June 28, 2013, ninety days after the termination of the MSA, TTV had still not paid for the 200 videos—the Works. TTV's accounts payable report confirmed that it owed Fryberger more than $125,000 plus interest for the Works. Ex. H; Ex. Y 308:11-18 (TTV 2004 Exam.); (Doc. #1-5 at 3); *see also* Ex. U ¶9.

### 3.  Fryberger revoked the implied licenses.

On July 30, 2013, after allowing TTV ample time to pay for the Works, Fryberger revoked the implied licenses for the 200 videos for which TTV had not paid. Ex. I. He revoked the implied license by emailing Apple Vacations and stating that "Apple [is] using unlicensed creative property to promote their resorts, since the copyrights still rest with my company [Fryberger]." Ex. I at 2. Fryberger sent the notice directly to Apple after having his employee, Amy Baumberger, confirm that Apple Vacations was displaying his Works on its website. Ex. X 164:15-165:8; Ex. W 66:19-67:8. This notice, which Apple promptly gave to TTV, revoked both Apple Vacations and TTV's right to use Fryberger's Works. *See* Ex. G.

Despite Fryberger's notice, neither Apple Vacations nor TTV discontinued the display, performance, and streaming of the Works. Ex. U ¶15. Instead, TTV sent a demand letter to Fryberger instructing him not to contact Apple Vacations. Ex. G. TTV sent that letter on August 13, 2013—less than two weeks after Fryberger revoked the licenses to use the videos that TTV

had not paid for. *Id*. Around this time, Strimbu told Fryberger that TTV would never pay

Fryberger and that if he kept pursuing TTV, she would dissolve TTV. Ex. U ¶11. On August 30,

2013, Strimbu formed RME. Ex. J. Starting September 1, 2013, RME took over hosting the

Works and invoicing Apple Vacations, issuing $60,000 of invoices on September 1, 2013. Ex. D

(Doc. #105-3). Strimbu also drafted and sent Apple Vacations a statement of work under TTV's

agreement with Apple Vacations, requiring Apple Vacations to make all future payments to

RME, not TTV. Ex. K ¶10 (Doc. #105-4).

   In February 2014, Fryberger again confirmed that Apple Vacations was displaying his

Works on its website and its social media accounts. Ex. X 164:15-165:8; Ex. U ¶12. Then,

through prior counsel, he sent Apple Vacations a second notice, requesting Apple "immediately

cease and desist from infringing his copyrights." Ex. L (Doc. #105-5). On July 11, 2014, Jim

Simms III, then-counsel for Apple Vacations, told Fryberger that Apple Vacations had ceased

using Fryberger's Works, claiming Apple Vacations had removed the Works and replaced them

with non-infringing videos in March and April of 2014. Ex. M. However, the replacement videos

were unoriginal recuts of Fryberger's Works. Ex. U ¶12; Ex. S 22:7-23:20 (30(b)(6) Apple

Vacations Dep.); Ex. Z-5 301:3-25, 303:5-17 (30(b)(6) TTV Sept. 1, 2016). These videos differ

in only superficial and absurd ways. *Id.* The music is the same; the voiceovers are the same; the

order of the scenes is the same. Ex. U ¶12. Fryberger promptly responded to Apple Vacations'

claim that it had replaced the Works with non-infringing videos, indicating it continued to

unlawfully use at least dozens of his Works to promote Apple Vacations' services. Ex. M. Apple

Vacations ignored Fryberger's demand and did not remove these Works. Ex. U ¶15.

   Sometime between February 2014 and September 2014, Fryberger sent TTV and Apple

Vacations another notice. Ex. N; Ex. U ¶13; Ex. X 155:18-156:12. His letter states,

> This is to again place you on notice that a large number of my copyrighted works are currently being and have, without license or permission, been used, licensed, published, displayed, and exploited through several different channels of dissemination, including YouTube.com, AppleVacations.com, the content distribution platforms controlled by VFM Leonardo, and the web sites controlled by Trip Television and The Rich Media Exchange. Any license, either expressed or implied to use, display, exhibit, or otherwise exploit my copyrighted creative works has been rescinded, is currently canceled, and will remain in rescission. […] The entities [TTV, RME, and Apple Vacations] did not vacate, and have now been infringing the intellectual property for over 18 months.

Ex. N (emphasis added).

By the fall of 2014, Fryberger concluded that the TTV and Apple Vacations would not stop infringing his Works. On October 1, 2014, Fryberger filed a *pro se* complaint against TTV and Apple Vacations claiming copyright infringement. (14-CV-02695-CBS Doc. #1). If TTV or Apple Vacations had any doubt that Fryberger has revoked the implied licenses, the *pro se* suit removed any doubt. After retaining undersigned counsel, Fryberger withdrew his *pro se* complaint and filed the instant action.

In May of 2015, after this action commenced, Streamside Productions, LLC, a company wholly-owned and controlled by Strimbu, purportedly transferred all of its assets, including its claimed rights to the Works, to RME. Ex. P; Ex. T 316:6-23. Based on this purported transfer, TTV's bankruptcy trustee brought four claims of fraudulent transfer and one claim for civil conspiracy against RME, Strimbu, and Streamside. (Doc. # 147-2). RME, Strimbu, and Streamside agreed to settle the claims and paid $40,000 to the TTV bankruptcy estate. (Doc. # 147-3).

TTV, RME, and Apple Vacations continued to unlawfully publish and display Fryberger's Copyrighted Works well into 2016. Ex. U ¶15. In July 2016, shortly after receiving an offer of settlement from Fryberger, Apple Vacations removed a substantial number of the Works from its website and its YouTube channel, but many of the Works remained on its

Facebook page and a YouTube channel controlled by Apple Vacations or its parent company. Ex. U ¶15.

As a matter of law Fryberger, owns the Works. RME, TTV, and Apple Vacations directly infringed Fryberger's copyright by displaying, performing, and streaming the Works to and through Apple Vacation's website. Ex. R. Strimbu as the president, CEO, and beneficial owner of RME and is vicariously and contributorily liable for the infringing conduct of RME, TTV, and Apple Vacations.

## C. Plaintiff is entitled to Summary Judgment on his First Claim: Copyright Infringement against Rich Media Exchange.

### 1. Burden of proof and elements.

To prove copyright infringement under 17 U.S.C. § 501, a Plaintiff must establish (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The plaintiff bears the burden of proof on both elements. *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005).

### 2. The undisputed facts show the Plaintiff is the owner of the Works.

#### a) Fryberger owns the copyright in the Works he created.

The copyright in a work initially vests in the author of the work. 17 U.S.C. § 201 (a). "In *Community for Creative Non-Violence v. Reid*, the Court held that '[a]s a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.'" 2 Patry on Copyright § 5:3 (citing *Commun. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989)).

Filming video and editing video invests ownership of the copyright in the camera operator or editor, or in the case of work-made-for-hire, in the hiring party. *See* 17. U.S.C. § 201;

*Community for Creative Non-Violence,* 490 U.S. at 737. The Works were filmed and/or edited by full-time employees of Fryberger sent to destinations to film resorts on behalf of Fryberger. Ex. V 32:2-18; 109:12-17; *see e.g.*, Ex. E. Their filming and editing were within the scope of their employment and was therefore work-made-for-hire. Fryberger is the author and copyright owner. 17 U.S.C. §101; *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir.1995) ("Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work."). Similarly, the Works were edited by Fryberger's full-time employees within the scope of their employment, and the copyright in those aspects of the Work is owned by Fryberger.

   b)  **The MSA does not transfer any copyrights from Fryberger to TTV.**

  Copyright ownership can be conveyed *only* by a writing signed by the owner of the copyright. 17 U.S.C. § 204(a) (A transfer of copyright ownership is not valid unless expressed in writing and signed by the owner). This fundamental principle of copyright law protects authors from persons mistakenly or fraudulently claiming licenses or transfers. *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1211 (10th Cir. 2009) (citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982). Accordingly, any purported transfer of copyright must be expressed "in a clear and unequivocal manner." *Jim Henson Prods., Inc. v. John T. Brady & Associates*, *Inc*., 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997) (internal citations omitted)*; Philipp v. Jerome H. Remick & Co.*, 145 F.Supp. 756, 758 (S.D.N.Y.1956) ("The clearest language is necessary to divest the author of the fruits of his labor.")), cert. denied, 348 U.S. 971, (1955) (emphasis added). "*Any* ambiguities or doubts concerning the scope of rights assigned by the [authors] ... must be construed in favor of the [authors]." *Mason v. Jamie Music Pub. Co.*, 658 F.Supp.2d 571, 581 (S.D.N.Y.2009) (citing *Jim Henson Prods.*, 16 F.Supp.2d at 285) (emphasis added). Transfer agreements should be construed in favor of the owner because section 204(a)

reflects the policy judgment that copyright owners should maintain all rights unless he or she specifically transfers them. *Papa's–June Music, Inc. v. McLean*, 921 F.Supp. 1154, 1160 (S.D.N.Y.1996).

The MSA does not express "a clear and unequivocal" transfer or assignment of copyright. The MSA does not contain a copyright section or any other section that can be reasonably interpreted to express an intent to *transfer* ownership of copyrights from Fryberger to TTV. It does not use any words indicating transfer or any *change* in ownership of any copyrights. The MSA does not use the words "transfer," "grant," "assign," "handover," "award," "endow," "give," "bestow," "convey," "devise," "confer," "bequeath," "exclusive license," or any other words of alienation of copyright ownership.

The absence of words expressing an intent to transfer ownership is highlighted by a comparison with the clear copyright assignment that TTV drafted and included in its Jamaica Agreement. (Doc. #1-1, ¶3.1 *et seq.*). Just two months earlier, TTV drafted the Jamaica Agreement, which includes a clear copyright assignment: "Service Provider [Fryberger] agrees to *irrevocably assign and convey* to Client [TTV] all rights, title, and interest in the same, to all captured images of the property or product-based content captured in both raw and edited formats." *Id*. This clear and unequivocal contract language is *required* to transfer or assign copyrights. *Jim Henson Prods.,* 16 F. Supp. 2d at 285. TTV chose not to include this language in the MSA.

### (1) The MSA's confidentiality clause does not transfer assignment copyrights.

The confidentiality clause in the MSA does not transfer Fryberger's copyrights to TTV. The confidentiality clause protects TTV's Confidential Information. It makes no mention of Fryberger's work. It plainly states, "All Confidential Information, and any derivative thereof

*remains* the property of TTV." (Doc. #1-2, at 4, emphasis added). The clause does not *transfer* any rights, copyrights, or otherwise from Fryberger to TTV. On the contrary, the clause uses the word "remain." The American Heritage Dictionary defines "remain" as "[t]o continue in the same state or condition." REMAIN, American Heritage Dictionary (5th ed. 20202). This definition accords with the common understanding of "remain" and confirms the clause protects TTV's rights in its "Confidential Information" by ensuring that TTV "*keep* and not lose, part with, or dismiss" its rights in its Confidential Information. On its face, it does not mention or concerns copyrights.

Even if the confidentiality clause could be construed to transfer or assign the copyright in "Confidential Information" or work based on "Confidential Information," TTV did not provide any Confidential Information to Fryberger. Strimbu testified that TTV did not give any confidential information to Fryberger. Ex. T 405:4-8. Nick Owen, a former employee of TTV, and Fryberger also testified that TTV did not give confidential information to Fryberger. Ex. V 111:21-112:25.

Moreover, the confidentiality clause expressly excludes material that "is currently, or becomes publicly known through no fault of the receiving party" and material that "is independently developed by the receiving party without the use of any Confidential Information." (Doc. # 1-2, at 5). RME, TTV, and Apple published, displayed, and streamed the Works on their websites. Ex. Q, Z-3. If TTV intended for the confidentiality clause to make it the owner of the Works, it would not have excluded Works that it knew would become public such as videos for publicly promoting Apple Vacations' resorts.

The undisputed evidence shows the MSA does not express "in a clear and unequivocal manner" any intent to transfer or assign Fryberger's copyrights to TTV. *See Warner Bros.*

*Pictures*, 216 F.2d at 949. Without a clear and unequivocal writing, no assignment or transfer and can exist.

### (2) The MSA's does not create a work-made-for-hire relationship.

Under the Copyright Act, a work is only made for hire if it is either: 1) created by an employee within the scope of their employment or 2) the work is commissioned in a written agreement stating that the work is a work made for hire. 17 U.S.C. § 101 ("if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.").

The MSA does not include the words "made for hire." (Doc #1-2). Nor does it contain any similar phrase that could be construed to have the same meaning. *Id.* For these reasons, the MSA's does not create a work-made-for-hire relationship, and the Works were not made for hire.

### 3.   The undisputed facts show RME infringed the Works.

Under the Copyright Act, the owner of a copyright has the "exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; [***] (4)in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly." 17 U.S.C. §106.

RME directly infringed Fryberger's audiovisual Works by streaming them for Apple Vacations and displaying, performing, and streaming the Works on and through Apple Vacations' website. RME began displaying and performing the Works at least as early as September 2013 and continued displaying and performing them through September 2015—

nearly a year after Fryberger filed his *pro se* action in October 2014. (14-cv-02695-CBS Doc #1).

TTV provide the video streaming and hosting services until August 2013. Then RME provides the streaming and hosting services from September 2013 through September 2015. Ex. D p.1, 3 (invoices showing billing for 2013-2014 and 2014-2105) (Doc. #105-3). On August 30, 2013, after Strimbu told Fryberger that TTV would never pay and that she would dissolve TTV, Strimbu switched the video streaming services from TTV to RME. Ex. U ¶11; Ex. D p. 1, 3 (Doc. #105-3). RME's invoices to Apple Vacations confirm that RME began invoicing Apple Vacation for these steaming services effective September 2013. Ex. D p. 1,3 (Doc. #105-3). RME's invoices describe the services as "Hosting and Streaming," "content distribution," and "Hosting/Streaming/ Distribution." *Id*. RME's invoices are consistent with a statement of work Strimbu sent to Apple Vacations, requiring Apple Vacations to stop paying TTV for streaming and start paying RME for streaming. Ex. K ¶10 (Doc. #105-4). RME also displayed, performed, and streamed the Works on and from its own website (rmexch.com). Ex. Q.

Apple Vacations and TTV configured their servers, so the video content displayed on Apple Vacations website was streamed from TTV or RME's servers. When a user visited certain pages at Apple Vacation's website, they would see a video window that would allow them to watch one of Fryberger's Works promoting an Apple Vacations resort. The video window and the image displayed in it were streamed, served, and distributed from RME's content server.[5] When the user played a video, the video was served and distributed from RME's content server.[5]

By streaming, distributing, displaying the Works, RME directly infringed Fryberger's

---

[5] If the user visited Apple Vacation's site before September 2013, the content was served from TTV's content server.

works.

### D.  Plaintiff is entitled to Summary Judgment on his Second Claim: Contributory Copyright Infringement Against Kulin Strimbu.

####    1.   Burden of proof and elements.

A defendant can be secondarily liable for another's copyright infringement under principles of contributory liability. *Warner Records Inc.*, 454 F. Supp. 3d 1069, 1082 (citing *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013). To establish a claim for contributory copyright infringement, a plaintiff must establish (1) direct infringement of a protected work; (2) "the defendant causes or materially contributes to another's infringing activities," and (3) "knows of the infringement." *Diversey*, 738 F.3d 1196, 1204 (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996)). The undisputed facts show Apple, TTV and RME directly infringed the Works.

The owner of a copyright has the exclusive right to reproduce, perform, and display the copyrighted work publicly. 17 U.S.C. §106.

Apple, TTV, and RME directly infringed Fryberger's Works by reproducing, displaying, performing, and streaming the Works on their websites. By September 2014, Fryberger had expressly revoked, rescinded, and canceled the implied licenses to use the Works. He expressly told Apple Vacations that "[a]ny license, either expressed or implied to use, display, exhibit, or otherwise exploit my copyrighted creative works has been rescinded, is currently rescinded, and will remain in rescission." Ex. N; Ex. U ¶13. Despite the express revocation of the licenses, Apple Vacations, RME, and TTV continued to use the Works. Ex. U ¶¶14-15. Apple Vacations displayed the Works on its website. Ex. R. RME and TTV streamed the Works to and through Apple Vacations' website. RME displayed, performed, and streamed the Works from its website. Ex. Q.

Fryberger and his staff repeatedly confirmed Apple Vacations was displaying and performing his Works through its website. Ex. U ¶¶11-13. Fryberger kept a detailed log of the infringing videos he found on Apple Vacations' website and its YouTube Channel. *Id*. ¶15. These undisputed facts show Apple, TTV and RME directly infringed Fryberger's Works.

### 2. Strimbu caused or materially contributed to TTV, Apple Vacations, and RME's infringing activities.

"One way of establishing contributory liability is by showing a defendant 'authorized the infringing use.'" *Id*. (quoting *Softel, Inc. v. Dragon Med. & Scientific Comms.*, Inc., 118 F.3d 955, 971 (2d Cir.1997) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 437, (1984))).

At all times relevant to this dispute, Strimbu was the President and CEO at RME. Ex. O. RME confirmed, "[t]he only members/ owners of RME are Peter Stimbu (1%) and Kulin Strimbu (99%) through the Peter V. & Kulin Strimbu Revocable Trust." Ex. Z p.3 (Resp. to Interrog. #2). As the CEO, president, and 99% owner of the trust that owns RME, Strimbucaused, materially contributed to or authorized the infringing use of the Works by causing RME (and TTV) to stream the Works through and to Apple Vacations' website. She also caused or authorized RME to publicly display, perform the works on RME's own website (rmexch.com) Ex. Q.

### 3. Strimbu knew of TTV, RME, and Apple's infringing activity.

Strimbu knew of TTV, RME, and Apple's infringing activity because, at all times relevant to this dispute, she was President and CEO of both RME and TTV. Ex. Z p.3. She knew that TTV had failed to pay Fryberger for the Works. TTV's financial records showed it owed Fryberger more than $125,000 for the 200 videos—the Works. *See* Ex. G. She knew that Fryberger terminated the MSA because TTV had failed to pay for the Works. See Ex. E. (Email

acknowledging debt). Strimbu, the CEO and president of TTV, knew TTV affirmed Fryberger's invoices, ratified the outstanding invoices, and agreed to pay 6.5% interest on them. (Doc. #1-5 at 3).

Strimbu also knew that Fryberger had revoked, rescinded, and canceled the implied licenses. Apple Vacations promptly gave Fryberger's notice to TTV. In response, Strimbu directed TTV's counsel to send a cease-and-desist letter to Fryberger. Ex. G. The undisputed evidence shows Strimbu knew of TTV, RME, and Apple Vacations' infringing activity.

### E.  Plaintiff is entitled to Summary Judgment on his Third Claim: Vicarious Copyright Infringement Against Kulin Strimbu.

#### 1.  Burden of proof and elements

A defendant can be secondarily liable for another's copyright infringement under principles of vicarious liability. *Warner Records Inc.*, 454 F. Supp. 3d 1069, 1082) (citing *Diversey*, 738 F.3d 1196, 1204. To establish a claim for vicarious copyright infringement, a plaintiff must establish (1) direct infringement of a protected work; (2) the defendant had "the right and ability to supervise the infringing activity;" and (3) "enjoyed a direct financial benefit from another's infringing activity." *La Resolana Architects*, PA, 555; *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One ... infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it").

#### 2.  The undisputed facts show TTV, RME, and Apple Vacations directly infringed the Works.

As shown above, TTV and RME directly infringed Fryberger's Works by streaming the Works to and through them to Apple Vacations' website. Apple Vacations directly infringed Fryberger's Works by displaying and performing the Works on its website. RME directly infringed Fryberger's Works by displaying and performing the Works on its website. Ex. Q.

**3. Strimbu had "the right and ability to supervise the infringing activity" of RME, TTV, and Apple Vacations.**

"[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Warner Records Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1086 (D. Colo. 2020) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007)).

Again, at all times relevant to this dispute, Strimbu was president and CEO of both RME and TTV. Ex. Z p.3. As president and CEO, she had the right and ability to supervise TTV's and RME's streaming/hosting services, including the streaming of the Works to and through Apple Vacation's website. She had the right and ability to supervise the streaming. She also had the legal right to stop or limit Apple's direct infringement by cutting off Apple Vacations' access to the Works hosted on and streamed from TTV and RME's servers.

**4. Strimbu "enjoyed a direct financial benefit" from TTV and RME's infringing activity.**

"The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Warner Records*, 454 F. Supp. 3d 1069, 1074 (quoting *Perfect 10*, 847 F.3d 657).

Strimbu, through her revocable trust, owned 99% of RME and therefore enjoyed 99% of the profits earned by RME. RME invoiced Apple for $60,000 for hosting the Works—this is a causal relationship between the infringing activity—streaming the Works—and the financial benefit—the revenue. Ex. D (Doc. #105-3). Strimbu enjoyed 99% of the direct financial benefit of RME's revenue from Apple Vacations. Strimbu also drafted and sent Apple Vacations a statement of work pursuant to TTV's agreement with Apple Vacations, requiring Apple Vacations to make all future payments directly to RME, not TTV. Ex. K ¶10 (Doc. #105-4).

Strimbu enjoyed 99% of this direct financial benefit from RME's revenue from Apple Vacations. Similarly, TTV earned $750,000 from Apple Vacation by delivering and streaming the Works. Ex. C. As the CEO and President of TTV, Strimbu enjoyed a direct financial benefit from this revenue.

**F.  Conclusion.**

Plaintiff's undisputed evidence establishes all of the elements of his claims. He is entitled to summary judgment on his First Claim against RME and his Second and Third Claims against Strimbu.

Fryberger unequivocally revoked the implied licenses at least as early as July 2013 when he asserted his exclusive rights in his Works. He reaffirmed his revocation of the implied licenses in his February 2014 demand letter and again in October 2014 when he filed his *pro se* complaint alleging infringement of the Works.

RME streamed Fryberger's Work from its serves to and through Apple Vacations' website from September 2013 through September 2015. RME continued to stream the Works despite Fryberger's repeated revocations of the implied licenses in July 2013, February 2014, and October 2014. *See* D (Doc. #105-3).

Strimbu as the managing member of RME and TVV, is secondarily liable for TTV and RME's infringing streaming of Fryberger's Works after he revoked the licenses. She is vicariously liable because she "enjoyed a direct financial benefit" from TTV, RME, and Apple Vacations' infringing activity, and she had "the right and ability to supervise [and stop] the infringing activity" by turning off the streaming. She is contributorily liable because she caused or materially contributed to TTV, RME, and Apple Vacation's infringing activities and she knew of the infringement.

For these reasons, Fryberger asks that this Court grant his motion for summary judgment on his First Claim against RME and his Second and Third Claims against Strimbu.

Dated: February 22, 2021.

Respectfully submitted,

THOMAS P. HOWARD, LLC


s/ Scott E. Brenner
Scott E. Brenner
Thomas P. Howard
842 W South Boulder Rd., #100
Louisville, CO 80027
303-665-9845
303-665-9847
sbrenner@thowardlaw.com
*Counsel for Plaintiff*