**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-00363-MSK-STV

CHARLES F. FRYBERGER d/b/a CHUCK FRYBERGER FILMS,
        Plaintiff,

v.

TRIPTELEVISION, LLC, a Nevada company,
KULIN STRIMBU, an individual,
RICH MEDIA EXCHANGE, LLC, a Colorado company
APPLE VACATIONS, LLC, a Delaware Corporation
        Defendants.

---

**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. # 153]**

---

Kulin Strimbu and Rich Media Exchange, LLC ("TTV Defendants"), through counsel, respectfully submit this Response to Plaintiff's Motion for Summary Judgment [Doc. # 153].

## I.    SUMMARY.

In his *Motion*, Plaintiff ("Fryberger") asks the Court to enter summary judgment in his favor on his claim for copyright infringement against Rich Media Exchange, LLC (Claim One) and his claims for contributory and vicarious copyright infringement against Kulin Strimbu (Claims Two and Three). Fryberger bears the burden of proof on each claim, so to obtain summary judgment, he must prove beyond any reasonable doubt each required element for is claims. The Court should deny Fryberger's motion because he failed to meet this stringent standard.

First, on his claim for copyright infringement, Fryberger has failed to establish that he was the exclusive copyright owner to the video content at issue. The evidence presented shows that TTV and Fryberger were joint authors of the video content. Even if not joint authors, Fryberger agreed TTV would own all video content, including the copyrights to the video content. Fryberger

also agreed to transfer all the finished and unfinished video content to TTV regardless of payment. The terms of the MSA and their course of dealing show that TTV owned the video content, or at least had the right to use the video content without risk of infringement. The bankruptcy settlement also precludes Fryberger's claim, as does his grant of an irrevocable license. Further, as explained below, there are disputed and genuine issues of material fact regarding the elements of Fryberger's copyright infringement claim that preclude summary judgment.

Second, Fryberger's claim for contributory copyright infringement fails because Fryberger cannot establish direct copyright infringement. It also fails because of the bankruptcy settlement and because of the implied license Fryberger provided, which is irrevocable. Fryberger's claim for contributory copyright infringement also fails because Fryberger has not presented undisputed evidence showing Kulin Strimbu actually knew TTV or RME was infringing on his copyright and materially contributed to the infringement.

Finally, Fryberger's claim for vicarious copyright infringement fails for similar reasons. His vicarious copyright infringement claim also fails because Fryberger has not presented undisputed and admissible evidence that would support a jury verdict on the element requiring him to show Ms. Strimbu received a "direct financial benefit" from the allegedly infringing conduct. At most, Fryberger showed that Ms. Strimbu was an owner of TTV and Rich Media Exchange, LLC (RME) and RME received fees for hosting/ streaming services. Such evidence is insufficient to prove the direct financial benefit element required for vicarious copyright infringement.

For each of these reasons, as described in more detail below, the Court should deny Fryberger's *Motion*. Instead, the Court should enter summary judgment against Fryberger for the reasons identified in the TTV Defendants' Motion for Summary Judgment [Doc. # 152].

## II.    RESPONSE TO STATEMENT OF FACTS.

In the "Background" Section of Plaintiff's *Motion*, Plaintiff identifies a number of facts that are immaterial to the elements of Plaintiff's claim or the TTV Defendants' defenses.  The TTV Defendants therefore do not respond to each of the immaterial factual issues Plaintiff identifies.  *See Faustin v. City & Cty. of Denver, Colo.*, 423 F.3d 1192, 1198 (10th Cir. 2005) ("Only material factual disputes can create a genuine issue for trial and preclude summary judgment.") (citing *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991)).

Relevant to Plaintiff's copyright claims, Plaintiff states "TTV hired Fryberger to create promotional videos, specifically videos promoting travel to Jamaica," which resulted in what Fryberger calls the Jamaica agreement.  *Motion*, p. 2.  Fryberger claims the contract was "very lucrative" for TTV.  The TTV Defendants dispute Fryberger's claim.  The revenue generated to TTV from Apple Vacations for filming and producing the videos was consumed by the costs of filming and producing the videos with other transactional costs, such as legal fees.  Indeed, TTV filed for Chapter 7 bankruptcy protection because it was insolvent and did not generate sufficient profit from the Apple Vacations projects to sustain operations.  *See* [Doc. # 147-1]; *see also TTV's Voluntary Petition for Ch. 7 Bankruptcy* (attached hereto as Ex. 1).  TTV operated at a loss in 2013 through 2015, with net losses of $96,775, $80,871 and $64,000 respectively.  *See TTV's Statement of Financial Affairs* (attached as Ex. 2); *see also TTV Amended Schedules* (attached hereto as Ex. 3) (showing additional debt contributing to additional losses).

Moreover, Plaintiff admits the July 17, 2012 "Jamaica agreement" required Plaintiff to provide production work on certain videos.  *See* [Doc. # 151-1] & [Doc. # 151-2], pp. 64:1-65:23.  It provided that TTV "will retain copyright ownership of Produced Content," which meant all of the videos Plaintiff captured, filmed or produced.  [Doc. # 151-1], p. 2, ¶ 3.1.  The July agreement

was sufficient to transfer any copyright Plaintiff claims by virtue of filming or editing the videos in question. *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1213-14 (10th Cir. 2009).

On September 4, 2012, TTV entered into a Master Service Agreement ("MSA") with Fryberger to provide additional work on videos from other locations. *See* [Doc. # 151-3]. In the MSA, the parties agreed to a broad and inclusive definition of "confidential information," which included all "data," "work," "computer programs," "production processes," "designs" and all "other documents or property" created pursuant to the MSA. *Id.*, p. 4. The parties also agreed that all of this "Confidential Information, and any derivative thereof remains the property of TTV, and no license, intellectual property rights or other rights to the Confidential Information are granted or implied hereby other than the limited right to use for the Purpose." *Id.*, p. 5. The MSA is sufficient to transfer any copyright Plaintiff claims by virtue of filming or editing the videos pursuant to the MSA. *SCO Grp., Inc.*, 578 F.3d at 1213-14.

Additionally, Fryberger notes that "TTV fell behind in paying Fryberger," and as a result, "Fryberger properly terminated the SMA effective March 29, 2013." *Motion*, p. 4. It is undisputed that TTV paid several of Fryberger's invoices and ultimately paid him $115,399.10. *See* [Doc. # 153-6], p. 2. TTV has admitted it failed to pay the remaining invoices Fryberger sent pursuant to the MSA and in doing so, breached the MSA. [Doc. # 115], p. 1.

Whether TTV breached the MSA is immaterial to Fryberger's claims against Kulin Strimbu and Rich Media Exchange, LLC. Neither Kulin Strimbu nor Rich Media Exchange, LLC were parties to the MSA [Doc. # 152-3], which is presumably why Fryberger did not sue either party for breach of contract. Fryberger's only claim against RME is for copyright infringement. [Doc. # 1], pp. 7-8, ¶¶ 84-94. His claims against Kulin Strimbu are for contributory copyright infringement (*Id.*, pp. 8-9, ¶¶ 95-110) and vicarious copyright infringement. *Id.*, pp. 9-10 ¶¶ 111-

4

121.  None of the elements for Fryberger's claims against RME or Ms. Strimbu requires proof of breach of the MSA.  *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 & 1181 (10th Cir. 2009).  Additionally, TTV's bankruptcy precludes Fryberger's claims against TTV (including breach of contract), rendering Fryberger's factual statements relating to TTV's breach of the MSA immaterial to any remaining issues.

Finally, in his "background" section, Fryberger claims that he "revoked the implied licenses" he provided to the TTV Defendants by sending an email to an employee of Apple Vacations on August 6, 2013.  *Motion*, p. 5 (citing email filed as Doc. # 153-9).  Fryberger contends that despite his notice to Apple Vacations, "neither Apple Vacations nor TTV discontinued the display, performance and streaming of the Works."  *Id.*

Fryberger's factual discussion regarding revocation of the licenses he granted is immaterial.  There is no dispute Fryberger gave an implied license to TTV, the TTV Defendants and Apple Vacations.  *See* [Doc. # 106], p. 2 ("TTV enjoyed *revocable* implied licenses to the Works"); *Id.*, p. 22 ("If TTV had paid the invoices, then the "implied licenses would have become irrevocable.").  Indeed, Fryberger testified that he provided permission to use the videos (e.g., a license) and the scope of the license he provided was unlimited, allowing end user to do whatever it wanted with the videos (including using them, storing tem, transferring them, monetizing them or displaying them).  *See* [Doc. # 152-2], pp. 125:6-126:4.

The TTV Defendants do not dispute that Fryberger *attempted* to revoke the licenses he provided as he described.  *Motion*, pp. 6-7.  But the licenses he previously granted were irrevocable if the TTV Defendants and/or Apple Vacations paid consideration for the works.  *See Xtomic, LLC v. Active Release Techniques, LLC*, 460 F. Supp. 3d 1147, 1155 (D. Colo. 2020); *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008) (holding plaintiff granted the defendant "an

5

unlimited, nonexclusive license to retain, use, and modify the software" subject to the copyright dispute which was irrevocable because the defendant "paid consideration" for it) (citing *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.,* 128 F.3d 872, 882 (5th Cir. 1997) and 3–10 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[B][5] (2008)).

There is no dispute that the TTV Defendants partially paid Fryberger, although it did not pay him in full. A license is irrevocable only if **no** consideration is provided. *See Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003) (applying Texas law to determine whether continued employment was sufficient consideration); *Sprengel v. Mohr*, No. CV 11-08742-MWF SPX, 2013 WL 645532, at *12 (C.D. Cal. Feb. 21, 2013) (applying California law to determine whether consideration was provided and concluding that the parties "exchange of promises" and contributions of small sums of money provided "sufficient and valuable consideration for the license's grant," rendering it irrevocable); *Karlson v. Red Door Homes, LLC*, 18 F. Supp. 3d 1301, 1316–17 (N.D. Ala. 2014), *aff'd*, 611 F. App'x 566 (11th Cir. 2015) (finding fact disputes about whether defendant continued to use plaintiff's works after revocation date was "not material to the issues before this court … [b]ecause plaintiff granted defendants an implied license in plaintiff's renderings" and "plaintiff received consideration for that license," so "plaintiff could not unilaterally revoke his grant of a license by announcing that he did not receive the deal or the consideration he actually wanted.").

The license is irrevocable if **some** consideration was provided for it, even when the defendant has not paid in full. *See Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990) (rejecting argument that implied license was revocable because defendant had not "paid in full the agreed-to price for the footage" and also rejecting argument that "payment in full" was "a condition precedent to implying a license."); *Reinicke v. Creative Empire LLC*, 38 F. Supp. 3d

1192, 1203–04 (S.D. Cal. 2014), *aff'd,* 669 F. App'x 470 (9th Cir. 2016) (disputes about the amounts defendant should have paid to plaintiff were immaterial because it was undisputed that defendant paid plaintiff around $9000 for implied license, which was sufficient to render the license irrevocable even if the payment was not paid the total payment due); *Fontana v. Harra*, No. CV 12-10708 CAS JCGX, 2013 WL 990014, at *5–6 (C.D. Cal. Mar. 12, 2013) (noting that "[f]ailure to provide payment in full can only void an implied license if the agreement giving rise to the license contains a conditions precedent clause requiring full payment," which would be improbable if the implied license is derived from oral statements or "course of performance," and "[c]onsequently, absent unusual circumstances, when a plaintiff enters an oral agreement to create a work for a defendant to copy or distribute, the plaintiff's proper course of action for seeking full payment is a breach of contract case, not a copyright infringement case.") (citations omitted).

Accordingly, regarding Fryberger's "background" discussion about his attempted revocation of the licenses he granted, the only disputed facts that would be material would be disputes as to whether TTV provided consideration to Fryberger for the license. But there are no such disputes. Fryberger admits TTV paid him $115,339. *See* [Doc. # 153-6], p. 2. Fryberger also admits he entered into the MSA, in which TTV made a number of binding promises, including the promise to pay. *See* [Doc. # 153], p. 3. TTV's payments and promises are sufficient consideration under Colorado law. *See* CJI-Civ. 30:7 (2020); *Troutman v. Webster*, 82 Colo. 93, 96, 257 P. 262, 263-64 (1927); *see also Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011) ("This court has long held that any benefit to a promisor or any detriment to a promisee at the time of the contract—no matter how slight—constitutes adequate consideration."); *Compass Bank v. Kone*, 134 P.3d 500, 502 (Colo. App. 2006) ("Consideration may be defined as 'a benefit received or something given up as agreed upon between the parties.'") (quoting CJI-

7

Civ. 4th 30:5 (1998)); *Denver Indus. Corp. v. Kesselring*, 90 Colo. 295, 297, 8 P.2d 767, 768 (1932) ("A promise for a promise is a valid consideration.").

## III.   LEGAL ARGUMENT.

### A.   The Court Should Deny Fryberger's Request for Summary Judgment on his Claim for Copyright Infringement Against Rich Media Exchange.

The TTV Defendants agree that Fryberger bears the burden of proof on his claim for copyright infringement. *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005). TTV Defendants also agree that Fryberger must prove two elements to establish his claim against RME for copyright infringement: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *Feist Pubs., Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)).

When, as here, the plaintiff bears the burden of proof at trial, "a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). To obtain summary judgment, Fryberger ""must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.* (citation omitted). Fryberger must prove "'beyond any reasonable doubt" that he is entitled to summary judgment.'" *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir. 1991) (quoting *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1437 (10th Cir. 1987)). Fryberger has not satisfied his burden, so the Court should deny Fryberger's *Motion*.

### 1.   Plaintiff Was Not the Sole Author and Does Not Exclusively Own Copyrights to the Works.

The Copyright Act of 1976 provides that "[c]opyright in a work protected under this title vests initially in the author or authors of the work." 17 U.S.C. § 201(a). "Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression, now known

or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device," including "motion pictures. 17 U.S.C. § 102(a)(8). The fixation of the author's work must be done "by or under the authority of the author." 17 U.S.C. § 101. "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

Fryberger claims he is the "author" of all the videos in question because they "were filed and/or edited by full-time employees of Fryberger sent to destinations to file resorts on behalf of Fryberger." *Motion*, p. 8. Fryberger claims to have filmed and edited approximately 260 videos. *See* [Doc. # 53-21], ¶ 5. He admits being paid $115,333 but claims to be owed an additional $90,000 for his video production and editing efforts. *Id.*, ¶ 9. Thus, he admits to being paid fifty-six percent of the total he invoiced for the video work. *Id.* Fryberger did not identify in his *Motion* the specific videos which he (or his employees) exclusively filmed for which he was not paid.

Summary judgment on the ownership element is inappropriate because there are fact disputes about who is the "author" of the videos. Ms. Strimbu testified that TTV delivered 432 videos to Apple Vacations. *See Strimbu Depo., Vol. 1*, p. 81:10-19 (excerpts attached as *Ex. 4*). Fryberger produced 50 to 60 of those videos. *Id.* Further, TTV owned numerous videos itself, which had been filmed before TTV entered the July 2012 service agreement and the September 2013 MSA. *Id.*, p. 83:24–86:11. Fryberger would edit those videos that TTV owned, but was not the author of them. *Id.* Ms. Strimbu disputed that Fryberger was the production company on all of the subject videos. *Id.*, pp. 115:13 – 116:18. Further, she testified that for the videos filmed in Mexico, there were "many production crews," which refutes Fryberger's claim that he is the sole author of the videos. *Id.*, p. 119:7-10. Genuine disputes also exist as to whether TTV, instead of

Fryberger, filmed some of the videos Fryberger is now claiming at the "Works" for which he was the author. *Id.*, p. 227:2-238:19. Accordingly, Fryberger has not proven beyond any reasonable doubt that he was the author of all the videos claimed.

Further, TTV arranged the production process, facilitated it, and participated in the production process, as required by its Master Service Agreement with AVW II (dba Apple Vacations). *See* [Doc. # 79-4]. For example, when Apple Vacations wanted a particular hotel property or excursion filmed, it would make that request of TTV and TTV would develop a Statement of Work (SOW) for each project specifying the details, expectations, requirements, pricing, and deliverables." *Id.*, p. 3. TTV would provide hosting and streaming platforms and services for the videos. *Id.*, p. 4. TTV would provide the insurance necessary for the production work. *Id.*, p. 6. TTV also was responsible for obtaining filming permits for the properties or destinations where the videos were to be filmed. *Id.*

TTV also had its own contractors involved in the production, such as Thom Strimbu, Jon Firestone and Frazer Lockhart. *See Ex. 4*, pp. 38:6–39:19; 87:21–88:20; 116:22–117:19; 186:22-187:5. These TTV agents and contractors also were authors because they combined their work with Fryberger's. As such, the videos would be "joint works" or authors of a "collective work." *See* 17 U.S.C. § 101 (defining the terms "joint work" and "collective work" for the Copyright Act); *Andrien v. S. Ocean Cty. Chamber of Com.*, 927 F.2d 132, 136 (3d Cir. 1991) (plaintiff, who contributed to a collection of maps, could be a joint author so summary judgment was improper). "For two or more people to become co-authors, each author must contribute some non-trivial amount of creative, original, or intellectual expression to the work and both must intend that their contributions be combined." *Brownstein v. Lindsay*, 742 F.3d 55, 64 (3d Cir. 2014) (citing 1 *Nimmer on Copyright* § 6.07 and *Gaiman v. McFarlane,* 360 F.3d 644, 658–59 (7th Cir. 2004)).

In *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000), the Ninth Circuit identified three criteria to use to determine whether a work is the product of joint authorship.  The first criteria is whether the author "superintended" the work by exercising control over it, such as what changes should be made and what should be included in the work.  *Id.* (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61, 4 S. Ct. 279, 282, 28 L. Ed. 349 (1884) and citing *Thomson v. Larson,* 147 F.3d 195, 202 (2nd Cir. 1998)).  The superintendent of the work will "likely be a person 'who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be-the man who is the effective cause of that,' or 'the inventive or master mind' who 'creates, or gives effect to the idea.'"  *Id.* (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. at 61).

The second criteria is whether the putative coauthors made "objective manifestations of a shared intent to be coauthors, as by denoting the authorship of *The Pirates of Penzance* as 'Gilbert and Sullivan.'"  *Id.* (citing *Thomson,* 147 F.3d at 202).  The third criteria is whether "the audience appeal of the work turns on both contributions and 'the share of each in its success cannot be appraised.'"  *Id.* (quoting *Edward B. Marks Music Corp. v. Jerry Vogel Music Co., Inc.,* 140 F.2d 266, 267 (2nd Cir.1944) (Hand, J.), *modified by,* 140 F.2d 268 (1944)).  The "most important factor" in many cases is who has control over the end product.  *Id.*; *see also Ford v. Ray*, 130 F. Supp. 3d 1358, 1362 (W.D. Wash. 2015) (applying these *Aalmuhammed* factors to determine claim of joint ownership to hip hop song "Baby Got Back").

Applying these factors here shows disputed fact questions exist which preclude summary judgment on the question of Plaintiff's claim to exclusive copyright ownership of the videos.  Although it contracted with Fryberger for production services, TTV was in control of those production services as they related to Apple Vacations.  *See* [Doc. # 79-4], pp. 2-4.  Fryberger also

11

agreed with TTV that TTV would have final control over whether a video was "satisfactory" and final control over whether any videos would be "approved."  *See* [Doc. # 152-3], p. 2.  TTV reserved the right to "white-label"[1] any content Fryberger created or edited so that TTV could retain control over the content.  *Id.*  Fryberger agreed to follow its travel and expense policies.  *Id.*, p. 3.  TTV had the right to control staffing on the filming projects and had to approve Fryberger's staff.  *Id.*  Fryberger agreed that "any and all video content files, finishes or unfinished, graphic files, and partially finished project work, will be immediately transferred to TTY hard drives" so that TTV would retain control, including editorial control.  *Id.*, p. 4.

TTV controlled Fryberger's work and content through Thom Strimbu.  TTV appointed Thom Strimbu as Director of Production who had ultimate creative control.  *Ex. 4*, pp. 13:23-14:10, 116:22-117:1 & 187:1-9.  Thom Strimbu had a lot of experience serving as production manager and provided creative direction in terms of shooting styles and producing quality video content.  *Id.*; *see also Id.*, p. 346:3-346:17.  Mr. Strimbu is the person who recommended Fryberger to TTV and evaluated the quality and content of the videos provided by Fryberger to TTV.  *Id.*

In *Ford,* the court evaluated similar facts and concluded that the first *Aalmuhammed* factor weighed heavily against the plaintiff because although plaintiff performed some of the creative parts of the music track (e.g., playing drums and making some of the beats), the decision of whether to include the creative works in the final track remained with the defendant.  *Ford*, 130 F. Supp.

---

[1]	The term white label describes a circumstance where a product is produced by one company and then rebranded by a second company to make it appear as if the product is their own. *See Fraserside IP L.L.C. v. Netvertising Ltd.*, 902 F. Supp. 2d 1165, 1171 n 3 (N.D. Iowa 2012); *Sandhills Glob., Inc. v. Garafola*, No. CV1920669MASTJB, 2020 WL 1821422, at *13 (D.N.J. Apr. 10, 2020), *reconsideration denied,* No. CV1920669MASTJB, 2020 WL 7029482 (D.N.J. Nov. 30, 2020) (describing witness' testimony regarding white labeling).

3d at 1363.  The defendant was the ultimate producer of the track (similar to Thom Strimbu) who worked in collaboration with the defendant (Sir Mix-A-Lot) to determine what content would be included in the final product.  *Id.; see also Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 969 (9th Cir. 2008) (explaining that although the plaintiff created and had control over an original story called the Treatment, which later became the Pink Panther, the plaintiff did not have control over how it would be incorporated into the defendant's motion picture); *Thomson*, 147 F.3d at 202-03 ("An important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work.").

The second factor is whether the putative coauthors made "objective manifestations of a shared intent to be coauthors…." *Aalmuhammed*, 202 F.3d at 1234.  TTV's agreement with Apple Vacations explains that TTV would be the sole party providing video content to Apple Vacations.  [Doc. 79-4], p. 3.  It did not provide for co-authorship or listing Fryberger as co-creator of the content.  *Id.*  Instead, it provided that all finished video content produced would be affixed with Apple Vacations' brand and be owned by Apple Vacations.  *Id.*  The agreement further provided that TTV would own in its entirety "[a]ll remaining content captured during the shoot."  *Id.*

TTV's agreement with Fryberger provided that TTV would have final control over whether a video was "satisfactory" and final control over whether any videos would be "approved."  *See* [Doc. # 152-3], p. 2.  It also required that Fryberger to provide to TTV "any and all video content files, finishes or unfinished, graphic files, and partially finished project work, even in the event of non-payment, so that TTV would retain control of the video content.  *Id.*, p. 4.  TTV's MSA with Fryberger also clarified that "All Confidential Information and any derivative thereof remains the property of TTV" and TTV was not giving to Fryberger any "intellectual property rights" to the video content or even a license to use the video content.  *Id.*, p. 5.  The contractual arrangements

were similar to those in *Aalmuhammed*, 202 F.3d at 1235, which the court determined weighed heavily against the plaintiff's suggestion of ownership to the copyrightable material.  Further, the facts are similar to *Ford*, where the court found that the plaintiff had not shown mutual intent to be co-authors because the plaintiff was never to be listed as a co-author and there were no other objective manifestations of an intent to be co-authors.  *Ford*, 130 F.Supp.3d at 1363; *see also Thomason*, 147 F.3d at 203 (noting that the agreements between the parties expressly stated that the defendant had final approval over all changes made to the play *Rent* and that such changes would be defendant's property, which refuted any claimed intent to be co-authors).

The third factor is whether "the audience appeal of the work turns on both contributions and 'the share of each in its success cannot be appraised.'"  *Aalmuhammed*, 202 F.3d at 1234 (quoted authority omitted).  Here, this factor balances equally between Fryberger and TTV.  The ultimate audience at issue here was Apple Vacations' customers, with the intermediate audience being Apple Vacations.  The appeal of the work to those audiences required contributions from Fryberger, in terms of filming the raw footage on location and then editing it.  The appeal also required contributions from TTV in terms of further editing, branding for Apple Vacations, as well as providing efficient access to the finished video content.

Here, as in *Ford,* "two of the three factors outlined in *Aalmuhammed* weigh heavily in favor of defendant, with the third factor being something of an unknown."  *Ford,* 130 F. Supp. 3d at 1364.  Because the balance of criteria weigh against Fryberger, the Court should reject Fryberger's claim that he is the sole author and copyright owner of the videos in question.

### 2.	Fryberger Is Not Presumed to Own Copyrights as Work-Made-For-Hire.

Glossing over whether Fryberger is the sole author whose creative or unique ideas were fixed onto a tangible expression, as required by the Act, Fryberger largely focuses on the work-

14

made-for-hire doctrine.  17 U.S.C. § 201(b) provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  *Id.*  Under this doctrine, work-for-hire copyright ownership of an original work fixed onto a tangible expression "can arise through one of two mutually exclusive means, one for employees and one for independent contractors, and ordinary canons of statutory interpretation indicate that the classification of a particular hired party should be made with reference to agency law."  *Cmty. for Creative Non-Violence*, 490 U.S. at 743.

The TTV Defendants concede that the individuals Fryberger hired to film and produce the videos for Fryberger were his employees.  So the work-for-hire doctrine renders Fryberger the author of the videos filmed or produced by his employees.  But hiring employees to film some videos does not make Fryberger the copyright owner for **all** the 260 videos he claims.  As referenced above, testimony showed TTV delivered 432 videos to Apple Vacations, but Fryberger produced only 50 to 60 of those videos.  *Ex. 4*, p. 81:10-19.  TTV filmed numerous videos even before TTV entered the July 2012 service agreement and the September 2013 MSA. *Id.*, p. 83:24–86:11.  Fryberger edited those videos, but was not their author.  Ms. Strimbu disputed that Fryberger was the production company on all of the subject videos.  *Id.*, pp. 115:13–116:18. Further, she testified that for the videos filmed in Mexico, there were "many production crews," which refutes Fryberger's claim that he is the sole author of the videos.  *Id.*, p. 119:7-10.

Even the evidence Fryberger cites does not support his claim that he is the sole owner of the videos through the work-for-hire doctrine.  Fryberger cited to the deposition of Nicholas Owen, one of his employees.  *Motion*, p. 9 (citing Exh. V, which is also Doc. # 153-22).  Mr. Owen

testified that as Fryberger's employee, he went to several destinations in three countries to shoot video, but he does not correlate any of the videos to any of the 260 videos for which Fryberger claims ownership.  [Doc. # 153-22], pp. 32:2-24.

Fryberger's work-for-hire argument also fails because it presupposes that Fryberger's employees would be the sole author of the videos absent the work-for-hire doctrine.  As explained above, that presumption is inaccurate because – at best – the facts indicate joint authorship between TTV and Fryberger for many of the videos in question.  There are fact disputes described above that preclude entry of summary judgment on this issue.

Finally, on the work-for-hire issue, Fryberger argues that the MSA between Fryberger and TTV does not qualify as a work-made-for-hire agreement because it does not include the words "made for hire."  *Motion*, p. 12.  Fryberger's argument is not well developed but fails in any event.

Under the Act, a work "made for hire" is:

(1)     a work performed by an employee within the scope of his or her employment; or

(2)     a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.  For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

17 U.S.C. § 101.  The first test does not apply because Fryberger was not TTV's employee.

Under the second test, "[a]n independent contractor's work will be classified as 'for hire' only if: (1) he was specially commissioned to create the work in question, (2) the created work falls within one of nine statutorily defined categories, and (3) the parties expressly agreed in a written instrument signed by them that the work would be a work made for hire. *Armento v. Laser Image, Inc.*, 950 F. Supp. 719, 728 (W.D.N.C. 1996), *aff'd*, 134 F.3d 362 (4th Cir. 1998) (citing 17 U.S.C. § 101(2)). Here, it is undisputed that TTV specifically commissioned Fryberger to create the videos in question. *See* [Doc. # 152-3], p. 1. It also is undisputed that the videos fall within one of the nine statutorily defined categories contained in 17 U.S.C. § 102(a)(8). The only material question relates to the third element – whether TTV and Fryberger expressly agreed in a written instrument signed by them that the work would be a work made for hire.

The Act's "work for hire" express writing requirement serves two functions. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992). First, the writing requirement serves "as a statute of frauds so that written agreements, rather than oral ones, will govern the distribution of copyrights in the 'for-hire' context." *Armento*, 950 F. Supp. at 728 (citing *Schiller*, 969 F.2d at 412). Second, the Act's "work for hire" express writing requirement serves the function "to make the 'ownership of the property rights in intellectual property clear and definite, so that such property will be readily marketable.'" *Id.* (quoting *Schiller*, 969 F.2d at 412).

Here, the MSA is a written agreement signed by TTV and Fryberger. [Doc. # 152-3], p. 6. The MSA explains that all "Confidential Information, and any derivative thereof remains the property of TTV, and no license, intellectual property rights or other rights to the Confidential Information are granted or implied hereby other than the limited right to use for the Purpose." *Id.*, p. 5. For copyrightable or copyrighted material, the MSA defined derivatives to mean "any

translation, abridgement, revision or other form in which an existing work may be recast, transformed or adapted." *Id.*  Thus, the MSA serves both requirements of the Act.

Fryberger claims that the MSA does not satisfy the Act because it does not contain the words "made for hire."  *Motion*, p. 12.  But "that omission is not fatal."  *Armento*, 950 F. Supp. at 730; *see also Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1141 (9th Cir. 2003) (explaining "there is no requirement, either in the Act or the caselaw, that work-for-hire contracts include any specific wording."); *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, No. 04 CIV. 0604 (CSH), 2004 WL 1781009, at *11 (S.D.N.Y. Aug. 10, 2004) ("As prudent as it may be, parties need not always use the phrase 'works made for hire' in order to fulfill the demands of the definition of the phrase under § 101(2).").

Here, as in *Armento* and the other cases cited, TTV presented the idea of creating the videos to Fryberger.  TTV and Fryberger reached the written agreement before production of any of the created content.  TTV incurred the expense of producing the videos, subject to the outstanding amounts owed under the MSA.  TTV set out its intention to own the commissioned work through the MSA.  TTV "acted at all times consistently with that relationship."  *Armento*, 950 F. Supp. at 732.  Thus, the MSA's language was sufficient to meet all of the requirements of a work made for hire by an independent contractor pursuant to 17 U.S.C. § 101.  *Id.*; *see also Logicom Inclusive, Inc.*, 2004 WL 1781009, at *11 (finding sufficient an agreement that did not contain the words "work for hire" but clarified that the work product created by the plaintiff "in furtherance of the services performed by Consultant to Company under this agreement shall be the sole property of the Company for the sole use of the Company and its clients").

The "work for hire doctrine creates a rebuttable presumption that [TTV] is the author of the [videos] and the copyright owner."  *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F.

Supp. 1533, 1544 (M.D. Fla. 1990)."  "This presumption shifts the burden of persuasion to [Fryberger] to prove by a preponderance of the evidence that the expressed or implied terms of the contract show an intention that the copyright should remain with [Fryberger]."  *Id.* (citations omitted); *see also Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998) (explaining that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done); *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368 (9th Cir. 1980) ("Under the 'works for hire' doctrine, when an employer hires an employee or an independent contractor to produce work of an artistic nature, the courts will presume in the absence of contrary proof that the parties expected the employer to own the copyright and that the artist set his price accordingly."); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965) ("[W]e believe that when one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.") (citations omitted).

Here, Fryberger has not rebutted this presumption, rendering summary judgment in Fryberger's favor improper.  The Court should reject Fryberger's claim that the MSA did not create a work for hire relationship between TTV and Fryberger.

### 3.    Fryberger Transferred Any Copyrights He May Have Owned for Filming or Producing the Videos to TTV.

As the TTV Defendants explained in their motion for summary judgment, even if Fryberger were the sole author of the videos, he does not own the copyrights to the videos because he

transferred them through the MSA.  [Doc. # 152], pp. 14-15.  Fryberger argues in his *Motion*, however, that the MSA was insufficient to transfer copyright ownership because it "does not express 'a clear and unequivocal transfer or assignment of copyright" because the MSA does not "contain a copyright section or any other section that can be reasonably interpreted to express an intent to *transfer* ownership of copyrights from Fryberger to TTV." *Motion*, p. 10.

Fryberger errs because the Act does not require talismanic language or spell out the requirements that must be included in a writing that transfers or assigns copyrights.  *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999).  All that is required is a writing that demonstrates an intent to transfer copyright ownership.  *Id.* (citing *Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989) and 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 10.03[A][2] at 10–37).

Here, it is undisputed that the MSA is a writing.  The terms of the MSA demonstrate Fryberger's and TTV's intent that any copyright Fryberger may have had to the video content would be transferred to TTV.  [Doc. # 152-3], p. 4 (providing that "[a]t no time, and for no reason, will [Plaintiff] withhold any video, graphic, or content files owned or applied to TTV work"); *Id.* (providing that TTV would own all confidential information); *Id.*, p. 5 (all confidential information, copyrights and an derivative work created by Fryberger "remains the property of TTV" and no "no license, intellectual property rights or other rights to the Confidential Information are granted or implied hereby other than the limited right to use for the Purpose.").

Fryberger responds that the MSA's terms are insufficient because it not contain the words "transfer," "assignment" or synonymous words.  *Motion*, p. 10.  His argument is factually and legally erroneous.  Fryberger's argument is factually erroneous because the MSA contains the

word "transferred" twice in the provided content paragraph and one in the effect of termination paragraph.  [Doc. # 152-3], pp. 3-4.

Fryberger's argument is legally erroneous because the Act does not require use of the terms "transfer" or "assignment" or synonymous words.  *See SCO Grp., Inc.*, 578 F.3d at 1212 (rejecting argument that writing was insufficient because it did not clearly state the copyrights to be transferred because "Section 204(a), by its terms, imposes only the requirement that a copyright transfer be in writing and signed by the parties from whom the copyright is transferred; it does not on its face impose any heightened burden of clarity or particularity."); *see also Sisyphus Touring, Inc. v. TMZ Prods., Inc.*, 208 F. Supp. 3d 1105, 1113 (C.D. Cal. 2016) ("The actual writing in a transfer of copyright does not have to explicitly state that copyright ownership is being transferred, and emails may be used to determine if there was a transfer.") (citations omitted); *Corbello v. DeVito*, 832 F. Supp. 2d 1231, 1245 (D. Nev. 2011) ("A transfer of copyright ownership need not use the words 'transfer' or 'assign' but must indicate an intent to effect an outright transfer of the copyright."); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (explaining that "a qualifying writing under Section 204(a) need not contain an elaborate explanation nor any particular 'magic words'") (citations omitted).

Indeed, because the Act contains no such requirement, courts have held that check endorsements and emails could constitute a signed writing that sufficiently satisfies 16 U.S.C. § 204(a)'s writing requirement.  *See Rico Recs. Distributrs, Inc. v. Ithier*, No. 04 CIV. 9782 (JSR), 2006 WL 846488, at *1 (S.D.N.Y. Mar. 30, 2006) (facts showing that purchaser of sound recordings endorsed checks for the purchase with comments such as 'Purchase of rights of EGC catalogue' and 'Bonus on L.P. recording agreement' were not on their face "sufficiently clear as to unambiguously evidence copyright transfer," but they could be "susceptible to such an

interpretation" such that summary judgment was improper); *Sisyphus Touring, Inc*, 208 F. Supp. 3d at 1113 (finding that emails which did not specifically say that artist was transferring copyright ownership to defendants still demonstrated artist's "intention was to transfer ownership to Defendants"); *Johnson v. Tuff-N-Rumble Mgmt., Inc.*, No. CIV.A.99-1374, 2000 WL 1145748, at *6 (E.D. La. Aug. 14, 2000) (check written "for 'assignment of Johnson's copyrights to Tuff City agreement dated June 17, 1997" was sufficient to satisfy writing requirement); *Dean v. Burrows*, 732 F. Supp. 816, 823 (E.D. Tenn. 1989) (endorsement of check with "the notation that it was written for 'mold designs and molds'" complied with "the requirements of 17 U.S.C. § 204(a).").

State contract law controls the question of whether the MSA demonstrated the parties' intent to transfer ownership of the copyrights in the videos from Fryberger to TTV.   *SCO Grp., Inc.*, 578 F.3d at 1209.   "The interpretation of a contract under Colorado law is a legal question." *Grant v. Pharmacia & Upjohn Co.*, 314 F.3d 488, 491 (10th Cir. 2002) (citing *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) and *Holland v. Bd. of County Comm'rs,* 883 P.2d 500, 505 (Colo. App. 1994)).   The "primary goal of contract interpretation is to determine and give effect to the intent of the parties." *Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000) (citation omitted).   "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself."  *Id.* "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation."  *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992) (citations omitted).  The MSA must be interpreted "in harmony with the plain and generally accepted meaning of the words employed." *Ad Two, Inc.*, 9 P.3d at 376.

Here, the MSA's purpose was clearly defined:  "TTV wishes to receive pre-production, production, and post-production services and CFF wishes to provide such pre-production,

production, and post-production services to TripTelevision."  [Doc. # 152-3], p. 1.  Fryberger

agreed to provide those production services to TTV and TTV agreed to pay Fryberger for his

services.  *Id.*, pp. 1-2.  Further, Fryberger agreed to provide to TTV copies of "all pre-production,

production. and post-production video, including video content files, finishes or unfinished,

graphic files, and partially finished project work (the 'Content) from the previous two (2) weeks

onto the hard drive provided by TTV" even before payment was due from TTV.  *Id.*, p. 3.

Fryberger also agreed to transfer "any and all video content files, finishe[d] or unfinished, graphic

files, and partially finished project work" immediately upon termination of the MSA, which would

include termination for nonpayment by TTV.  *Id.*, p. 4.  These terms demonstrate Fryberger's and

TTV's intention that all of the video content would be "transferred" to TTV because the parties

intended TTV to own the video content in any form.

Further, Fryberger agreed that TTV's information – including the location of the video

shoots, what was filmed, etc. – was confidential information belonging to TTV.  *Id.*, p. 4.  That

included TTV's copyrights, which reasonably construed, also would mean work that could be

copyrighted, such as the videos.  *Id.*  Fryberger agreed that all such information "and any derivative

thereof remains the property of TTV."  *Id.*, p. 5.[2]  Construing these terms in harmony, for any

information belonging to TTV, as described above, the information (including videos) belonged

to TTV.  *Id.*  For any content developed or edited by Fryberger, Fryberger agreed to transfer that

content immediately to TTV, which would make TTV the owner of such information.  *Id.*, pp. 3-

4.  The transfer would, by definition, wrap the content into the "Confidential Information"

---

[2]       The video content is derivative of TTV's confidential information because it was only created at TTV's
direction by providing Fryberger information about where the videos would be filmed, what should be depicted, etc.
The video content derived from TTV's work and agreement with Apple Vacations, so it was derivative of the
"Confidential Information" TTV provided to Fryberger.

language in the MSA, *Id.*, p. 4, which the MSA clearly indicated would belong to TTV.  *Id.*, p. 5.
Accordingly, Fryberger errs when he claims that the MSA did not transfer copyrights to TTV.

Even accepting *arguendo* Fryberger's argument that there is a lack of clarity or an
ambiguity in the MSA about whether the parties intended that Fryberger would transfer any claim
of copyright ownership to TTV, summary judgment would be improper.  *SCO Grp., Inc.*, 578 F.3d
at 1209 (when "a contract is ambiguous and allows the introduction of external evidence to
determine the contract's construction, 'then interpretation of the contract becomes a question of
fact.'") (quoting *Stegall v. Little Johnson Assocs., Ltd.,* 996 F.2d 1043, 1048 (10th Cir. 1993)).
Indeed, when "a contract is determined to be ambiguous, as here, the meaning of its terms are
generally an issue of fact to be determined in the 'same manner' as other factual disputes,"
rendering summary judgment improper.  *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist.
No. 2*, 935 F. Supp. 2d 1052, 1055 (D. Colo. 2013) (citations omitted).

### 4. Fryberger's Claims Are Barred by the Bankruptcy Settlement.

Finally, as the TTV Defendants explained in their summary judgment motion, the
Bankruptcy Trustee in TTV's bankruptcy case entered into a court-approved final Settlement
Agreement and Release with RME and Ms. Strimbu.  [Doc. # 152], pp. 3-11.  The settlement
Agreement binds all creditors of TTV's estate, including Fryberger.  *Id.*  In addition to providing
an irrevocable license, Fryberger therefore is not entitled to summary judgment on any of his three
remaining claims because of the settlement.

### B. The Court Should Deny Fryberger's Request for Summary Judgment on his Claim for Contributory Copyright Infringement Against Kulin Strimbu.

Fryberger also moved the Court to enter summary judgment on his claim against Ms.
Strimbu for contributory copyright infringement.  To establish a claim for contributory copyright

infringement, Fryberger must first establish direct infringement on his first claim and then also establish: (1) Ms. Strimbu knew or had reason to know of the infringing activity; (2) Ms. Strimbu intentionally induced and materially contributed to the infringing activity. *La Resolana Architects, PA*, 555 F.3d at 1181 (citing *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930–31, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)).  Fryberger bears the burden of proof on each element of his contributory copyright infringement claim.  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1146 (10th Cir. 2016).

Fryberger is not entitled to summary judgment on his contributory copyright infringement claim for four reasons.  First, he is not entitled to summary judgment because of the bankruptcy settlement.  [Doc. # 152], pp. 3-11.  Second, he is not entitled to summary judgment because he cannot establish direct infringement for the reasons explained above.  *See supra.*  Third, Fryberger is not entitled to summary judgment because Fryberger provided an implied irrevocable license to use the video content.  [Doc. # 152], pp. 16-28.

Finally, Fryberger is not entitled to summary judgment on his claim for contributory copyright infringement because he has not presented undisputed facts showing Ms. Strimbu knew that TTV or RME was infringing on his copyrights and materially contributed to the infringing activity.  Ms. Strimbu, as an officer of both TTV and Rich Media Exchange, reasonably believed that Fryberger had agreed that TTV owned the content, through the MSA, and that Fryberger agreed to transfer all content through the MSA.  *See supra.*  Thus, she did not know of TTV was infringing and materially contribute to TTV's infringement.  *See Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) (explaining that contributory liability attaches only when defendant causes or materially contributes to another's infringing activities "and knows of the infringement.") (citing *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir. 1996)); *Gershwin Pub.*

*Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (explaining that contributory copyright infringement requires proof that defendant acted "with knowledge of the infringing activity"); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (explaining that defendant must have actual knowledge that she was using specific infringing material to be liable for contributory copyright infringement) (citation omitted); *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (affirming dismissal of contributory copyright infringement because plaintiff did not allege plausible facts to show "the requisite knowledge of specific infringement" and such a claim requires "more than a generalized knowledge by the [defendant] of the possibility of infringement").

**C.  The Court Should Deny Fryberger's Request for Summary Judgment on his Claim for Vicarious Copyright Infringement Against Kulin Strimbu.**

Fryberger also moved the Court to enter summary judgment on his claim against Ms. Strimbu for vicarious copyright infringement.  To establish a claim for vicarious copyright infringement, Fryberger must first establish direct infringement by TTV or RME and also establish: (1) Ms. Strimbu "'enjoyed a direct financial benefit from *another's* infringing activity;'" and (2) Ms. Strimbu had "'the right and ability to supervise the infringing activity.'"  *La Resolana Architects, PA*, 555 F.3d at 1181 (quoting *Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004)).  Like his claim for contributory copyright infringement, Fryberger is not entitled to summary judgment on his vicarious copyright infringement claim for several reasons.

First, he is not entitled to summary judgment on this claim because of the bankruptcy settlement.  [Doc. # 152], pp. 3-11.  Second, he is not entitled to summary judgment on this claim because he cannot establish direct infringement for the reasons explained above.  *See supra.*  Third, Fryberger is not entitled to summary judgment on this claim because he provided an implied irrevocable license to use the video content.  [Doc. # 152], pp. 16-28.

26

Fourth, regarding the "direct financial benefit" element, Fryberger has not presented undisputed evidence proving "'beyond any reasonable doubt' that he is entitled to summary judgment,'" *Hicks,* 942 F.2d at 743 (quoting *Ewing,* 823 F.2d at 1437. Fryberger argues that Ms. Strimbu enjoyed a direct financial benefit because she was the 99% owner of RME and RME received $60,000 for hosting services. *Motion*, p. 17. Such evidence is, at most, evidence of *indirect* financial benefit, which is insufficient. *Ellison*, 357 F.3d at 1079.

Apple Vacations paid for the content hosting and streaming services for a monthly fee regardless of the content posted. *See* [Doc. 79-4], p. 5. The hosting services payment was not directly tied to infringing videos. *Id.* Further, Fryberger has not presented any evidence showing that RME's customer – Apple Vacations – subscribed for the hosting or streaming services "because of the available infringing material or canceled subscriptions because it was no longer available." *Ellison*, 357 F.3d at 1079. Fryberger also has not presented undisputed evidence showing a direct casual connection between the pre-arranged fees Apple Vacations agreed to pay for hosting and services and the infringing activity claimed. Thus, like the plaintiff in *Ellison*, Fryberger "has not offered enough evidence for a reasonable juror" to conclude that Kulin Strimbu received a direct financial benefit from TTV's or Rich Media's alleged infringement and "no jury could reasonably conclude that [Ms. Strimbu] received a direct financial benefit from providing access to the infringing material." *Id.* Summary judgment in Fryberger's favor is inappropriate.

## IV.   CONCLUSION.

WHEREFORE, for the foregoing reasons, TTV Defendants respectfully request the Court deny Plaintiff's Motion for Summary Judgment [Doc. # 153].

27

DATED:  March 22, 2021.

s/ Troy R. Rackham
Troy R. Rackham
SPENCER FANE, LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
trackham@spencerfane.com

*Attorney for Defendants Kulin Strimbu and Rich Media Exchange, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas P. Howard
Scott E. Brenner
William C. Groh
Thomas P. Howard, LLC
842 W South Boulder Rd., #200
Louisville, CO 80027
*Attorneys for Plaintiff*

Andrew D. Ringel
Conor Boyle
Hall & Evans, LLC
1001 17th Street, Suite 300 Denver,
CO 80202

*Attorneys for Apple Vacations, LLC*

s/  Troy R. Rackham