## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00363-MSK-NYW

CHARLES F. FRYBERGER d/b/a CHUCK FRYBERGER FILMS,

     Plaintiff,

v.

TRIPTELEVISION, LLC, a Nevada company,
KULIN STRIMBU, an individual,
RICH MEDIA EXCHANGE, LLC, a Colorado company
APPLE VACATIONS, LLC, a Delaware Corporation

     Defendants.

## REPLY IN SUPPORT OF TRIPTELEVISION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 152]

Defendants Kulin Strimbu and Rich Media Exchange, LLC, through counsel, respectfully submit this Reply in Support of their Motion for Summary Judgment [Doc. # 152].

## I.     SUMMARY OF ARGUMENT.

Plaintiff Charles Fryberger ("Fryberger") has three remaining claims in this case. He has asserted a claim for copyright infringement against Rich Media Exchange, LLC ("RME"). He has asserted claims for contributory and vicarious copyright infringement against Kulin Strimbu. Ms. Strimbu and RME (the "TTV Defendants") moved for summary judgment on these remaining claims for three reasons. [Doc. # 152]. First, the Settlement Agreement and Release in TTV's bankruptcy is binding on Fryberger. That Agreement released all claims related to the adversary proceeding the bankruptcy Trustee filed, including Fryberger's claims here, which bars Fryberger's recovery on such claims in this case. Second, on the merits of Fryberger's claims, the TTV Defendants urged the Court to enter summary judgment because Fryberger's

contract with TTV provided that TTV owns all copyrights to the content. Finally, even if Fryberger retained the copyright under his contract with TTV, RME and Ms. Strimbu had an irrevocable nonexclusive license to use the videos, defeating Fryberger's claims.

In his *Response* Doc. # 158], Fryberger claims that the settlement entered in the bankruptcy case does not bar his claims because he was not a party to that case and did not sign the settlement agreement.  His argument fails, however, because the Trustee was empowered to and did assert claims on Fryberger's behalf.  The Trustee signed and agreed to the court-approved settlement agreement and release as Fryberger's and the other creditors' "virtual representative," which binds Fryberger.

Fryberger also argues that he did not transfer copyrights to TTV through the Master Service Agreement.  But Fryberger relies on an overly technical and formalistic interpretation of the law.  It is clear that as long as a writing is signed by the creator of the works, no magical or talismanic words are required to transfer ownership.  Fryberger admits he signed the MSA.  The terms of the MSA demonstrate the parties intent to transfer copyright ownership to TTV.  The parties course of dealing confirms this.  Because Fryberger agreed TTV would own all video content, including the copyrights to the video content, all three of his copyright claims fail.

Finally, Fryberger argues that the nonexclusive implied licenses which arose from the parties conduct were revocable because of an absence of consideration or because of TTV's lack of substantial performance.  Fryberger's argument fails because it misapplies fundamental concepts of contract law.  The failure by TTV to perform under the MSA does not affect the rights granted by the implied license, but instead allows Fryberger to sue only TTV for breach of

contract – a claim now barred by TTV's bankruptcy.  The Court should enter summary judgment on all of Fryberger's remaining claims.

## II.   CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT.

### A.   THE COURT SHOULD ENTER SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS BECAUSE THE SETTLEMENT AGREEMENT AND RELEASE BARS PLAINTIFF'S CLAIMS.

In his *Response* [Doc. # 158]. Fryberger argues summary judgment is not proper on his claims against the TTV Defendants based on the bankruptcy settlement for three reasons.  First, he claims that he was not a party to the bankruptcy settlement so it does not bind him.  *Response,* pp. 3-4.  Second, he claims that the bankruptcy settlement agreement's release does not include the claims he asserted against the TTV Defendants in this case.  *Id.*, pp. 4-5 & 8.   Third, Fryberger claims that the authorities upon which the TTV Defendants rely are overstated or do no compel the conclusion that the bankruptcy settlement bars Fryberger's claims.  *Id.*, pp. 6-8. Each of Fryberger's arguments fail.

### 1.   The Trustee Was a Party to the Settlement and Acted as Fryberger's and Other Creditors' Virtual Representative, Binding Fryberger.

First, Fryberger argues he was not a party to the settlement agreement and release approved by the bankruptcy court, so it is not binding on him.  *Response*, p. 3.  It is true that Fryberger was not a party to the settlement agreement with the Trustee, but that is immaterial because Fryberger was a creditor of TTV's bankruptcy estate.

It is undisputed that after TTV filed bankruptcy, the bankruptcy court appointed David V. Wadsworth as the Trustee for the TTV Estate.   [Doc. # 147-1, p. 2].  On May 6, 2016, the Trustee filed an Application to Employ the Johnson Law Firm as Attorneys for the Trustee (attached as *Ex. 1*).  There, the Trustee sought permission to employ counsel "to investigate

transfers of the Debtor's property, to recover property **for the bankruptcy estate**, and if necessary, to represent the Trustee in connection with the litigation of any claims arising out of the transfers and/or recoverable assets described above."   *Id.*, ¶ 4 (emphasis added).   The bankruptcy court approved the Application to Employ on June 3, 2016.  [Doc. 147-1], p. 2.

On November 9, 2017, the Trustee filed an adversary proceeding against RME, Streamside, and Kulin Strimbu.   [Doc. # 147-2].   The Trustee alleged in the adversary proceeding that Ms. Strimbu was in charge of the operations and management of TTV, RME and Streamside.  *Id.*, ¶¶ 12-19. Further, the Trustee alleged "Rich Media operates the same business as the Debtor, performing the same services as did the Debtor, for essentially the same clients as did the Debtor, pursuant to the essentially same or similar contracts as the Debtor."   *Id.*, ¶ 19. The Trustee alleged that TTV and Ms. Strimbu improperly transferred assets to RME and Streamside, which "was done with the actual intent to hinder, delay, or defraud creditors of the Debtor." *Id.*, ¶ 24.

The Trustee alleged – on behalf of the creditors of TTV's bankruptcy estate –- that he was entitled to damages from Rich Media Exchange, LLC and Ms. Strimbu because their alleged actions damaged "Creditors of the Debtor" and "reduced the assets of the Debtor against which the Debtor's creditors could collect."   *Id.*, p. 9, ¶ 66.  One of the specific creditors who had his potential for recovery against TTV reduced, according to the Trustee, was Fryberger.  *Id.*, ¶ 26.

The bankruptcy code "makes clear that the trustee is the representative of the bankruptcy estate and that suits brought on behalf of or against the bankruptcy estate must be brought in the trustee's name."  *In re McCaull*, 494 B.R. 81 (B.A.P. 10th Cir. 2009) (citing 11 U.S.C. § 323(a) and *Bellini Imports, Ltd. v. Mason and Dixon Lines, Inc.,* 944 F.2d 199, 201-02 (4th Cir.1991)).

The Trustee stands in the shoes of creditors of the bankruptcy estate when asserting claims similar to those asserted by the Trustee in the TTV bankruptcy.  *See Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1342-43 (7th Cir. 1987).

The bankruptcy court-approved settlement between the trustee, Rich Media Exchange, LLC and Ms. Strimbu "serves as a prior final judgment" which is entitled to the same "res judicata effect as litigated judgments."  *Hoxworth v. Blinder*, 74 F.3d 205, 208 (10th Cir. 1996) (citations omitted).  When, on the creditors' behalf, the trustee asserts claims against corporate insiders to bring assets back into the estate, an identification of interests exists such that the Trustee's settlement binds creditors because the Trustee acts as the creditors' "virtual representative."  *In re Medomak Canning*, 922 F.2d 895, 901 (1st Cir. 1990) (citations omitted).  It does not matter that the creditors themselves are not parties or signatories to the settlement agreement.  *Id.*; *see also In re MS55, Inc.*, 2007 WL 2669150, at *12 ("[A] trustee – to achieve equity for all unsecured creditors – must be the sole entity with the power to pursue suits regarding damages claims common to all unsecured creditors.") (citations omitted); *In re Emoral, Inc.*, 740 F.3d 875, 829 (3d Cir. 2014) (holding the district court properly found that the plaintiffs' cause of action for successor liability fell within the scope of the claims the trustee released in a settlement agreement, which precluded the plaintiffs' pursuit of that claim in state court proceedings).

Here, likewise, the Trustee pursued claims against Rich Media Exchange, LLC and Ms. Strimbu – corporate affiliates and insiders of TTV – to bring assets back into the estate for the benefit of TTV's creditors, including Fryberger.  [Doc. # 147-2].  The Trustee was Fryberger's and all other TTV's creditors' virtual representative.  By settling those claims with bankruptcy

court approval, the Trustee bound the creditors to the settlement even if the creditors individually – and Fryberger specifically – did not sign the settlement agreement.

>    **2.      The Bankruptcy Settlement Includes Fryberger's Claims.**

Second, Fryberger argues that the bankruptcy-court approved settlement between the Trustee, Rich Media Exchange, LLC and Ms. Strimbu does not require summary judgment because he claims that the settlement agreement does not include his claims. *Response*, pp. 4-5. He argues that the settlement only included and released the fraudulent transfer claims. *Id.*

Although true that the Trustee had asserted claims against Rich Media Exchange, LLC and Ms. Strimbu for fraudulent transfer, the release the Trustee provided and the court approved was not so limited. It stated:

>    Upon Bankruptcy Court approval of this Agreement and receipt and negotiation of the Settlement Amount, the Trustee, on behalf of himself, and his heirs, successors and assigns, hereby remises, releases, acquits, and forever discharges Defendants, their attorneys, and theirs heirs, successors and assigns, of and from any and all liability, obligation, claims, actions, causes of action, demands, damages, punitive damages, treble damages, statutory penalties, costs, attorney's fees, and/or expenses whatsoever arising out of or relating to the Adversary Proceeding.

[Doc. # 147-3], p. 2, ¶ 4. By using the broad term "any and all claims … arising out of or relating to the Adversary Proceeding," the release applied to the whole or complete universe of claims that were or could have been asserted in the adversary proceeding. *See Colorado Dep't of Revenue v. Woodmen of the World*, 919 P.2d 806, 814 (Colo. 1996) (discussing the meaning of the term "all" and describing it as being synonymous with "every" and "each"); *City & Cty. of Denver v. Dist. Court*, 939 P.2d 1353, 1366 (Colo. 1997) (discussing the term "related to" and explaining it is broad in reach); *Smith v. Multi-Fin. Sec. Corp.*, 171 P.3d 1267, 1270 (Colo. App. 2007) (construing terms "arising out of" or "relating to" as being very broad).

Fryberger's claims for copyright infringement, contributory copyright infringement and vicarious copyright infringement are claims for damages that arose out of the same conduct, and relate to the same conduct, as the conduct alleged in the adversary proceeding – e.g., transferring video assets from TTV to others for use or to avoid paying creditors like Fryberger.  [Doc. # 147-2], pp. 3-9, ¶¶ 21-23, 26, 28-38, 47-52, 62-66.  Accordingly, by agreeing to release and forever discharge Rich Media Exchange, LLC and Ms. Strimbu "from any and all liability, obligation, claims, actions, causes of action, demands, damages, punitive damages, treble damages, statutory penalties, costs, attorney's fees, and/or expenses whatsoever arising out of or relating to the Adversary Proceeding," [Doc. # 147-3], p. 2, ¶ 4, the Trustee released the claims Fryberger is pursuing against the TTV Defendants here.

Fryberger claims that the TTV Defendants are latching "onto a single paragraph in the [Adversary Proceeding] Complaint that alleges 'the Debtor lists additional creditors and claims on its schedules, including a $150,000.00 claim by Charles Fryberger for breach of contract and copyright infringement.'"  *Response*, p. 4.  Although that paragraph is sufficient, for the reasons stated above, Fryberger errs.  The Trustee alleged that Rich Media Exchange, LLC and Ms. Strimbu transferred the video assets originally filmed by Fryberger "to hinder, delay, or defraud creditors of the Debtor, including VPR and Fryberger."  [Doc. # 147-2]. P. 8, ¶ 63.  The Trustee also alleged that Rich Media Exchange, LLC and Ms. Strimbu transferred the video assets originally filmed by Fryberger to "insiders" to "hinder, delay or defraud creditors," which included Fryberger himself.  *Id.*, p. 4, ¶ 32.  The Trustee further alleged that Rich Media Exchange, LLC and Ms. Strimbu were "mediate transferees" who received the video assets for little or no value, and the Trustee sought to avoid those transfers.  *Id.*, p. 5, ¶¶ 36-42.  In addition,

7

the Trustee alleged that Ms. Strimbu and Rich Media Exchange, LLC transferred the video assets "with the actual intent to hinder, delay, or defraud creditors of the Debtor, including but not limited to VPR and Fryberger." *Id.*, p. 6, ¶ 48.

Accordingly, the Trustee explicitly stood in Fryberger's shoes and pursued claims against Rich Media Exchange, LLC and Ms. Strimbu based on transferring and using the video assets. Here, likewise, Fryberger is pursuing claims against Rich Media Exchange, LLC for using or transferring the video assets originally filmed by Fryberger because he claims Rich Media Exchange, LLC did so "without license or authority." [Doc. # 1]. p. 7, ¶ 87. He claims that Rich Media Exchange is distributing the videos on its website. *Id.*, p. 8, ¶ 91. By doing so, he claims Rich Media Exchange, LLC violated his copyrights, causing him damage. *Id.*, ¶¶ 92-93. Fryberger is pursuing claims against Ms. Strimbu for materially contributing to TTV's or Rich Media Exchange, LLC's copyright infringement by using, distributing or transferring the video assets without his permission, which caused him damage. *Id.*, pp. 8-9, ¶¶ 97-98 & 101-106. Finally, Fryberger is pursuing claims against Ms. Strimbu for receiving a direct financial benefit from using, distributing or transferring the video assets without Fryberger's permission, which caused him damage. *Id.*, pp. 9-10, ¶¶ 113-119. Fryberger's claims here "relate to" to the claims the Trustee pursued in the adversary proceeding because they touch upon the same or similar subject matter. Thus, Fryberger's claims are barred. *See Let's Go Aero, Inc. v. Cequent Performance Prod., Inc.*, 78 F. Supp. 3d 1363, 1375 (D. Colo. 2015) (finding claims that defendant manufactured, sold or distributed inventions in violation of party's trademarks or copyrights related to conduct covered by settlement agreement, so claims were arbitrable); *City*

& *County of Denver v. Dist. Court,* 939 P.2d 1353, 1364 (Colo.1997) (explaining claims "relate to" dispute if they touch upon mattes covered by agreement) (citations omitted).

### 3.     TTV Defendants Did Not Misconstrue or Misapply the Law.

Finally, Fryberger claims that the TTV Defendants "misapply the holdings from *In re MS55,* [2007 WL 2669150, at *12] and *Delgado* [*Oil Co., Inc. v. Torres,* 785 F.2d at 857, 861 (10th Cir. 1986)]." *Response*, p. 6. Fryberger claims that *MS55* and *Delgado* only allow the Trustee "the right to recover the debtor's corporate debts." *Id.* Respectfully, Fryberger is the party who misconstrues *Delgado* and *MS55*.

In *Delgado,* the plaintiff claimed that Cleveland, a director of the debtor oil company, "made false representations about the company's financial statements on which Delgado relied in extending credit" to the company. 785 F.2d at 859. The plaintiff filed suit in the district court in Wyoming. *Id.* While his suit was pending, the oil company filed for bankruptcy protection. Because the company itself was not a party to that suit, the automatic stay did not apply. *Id.* The plaintiff obtained a judgment against Cleveland for losses that the plaintiff incurred. *Id.* The question presented in the case was "whether the filing of a bankruptcy petition by a corporation deprives the district court of jurisdiction to try the issue of a preferential transfer by a corporate director." *Id.*, p. 860. The court held it did because the creditor's claim was "preempted by the bankruptcy case." *Id.*, at 861. The reason it was preempted was that the creditor's relationship with the corporate insider "applied to all creditors" of the debtor, not just the plaintiff, and the "intervention of the bankruptcy case … prevent[ed] the inequity of one creditor recovering more on its debt than the remaining similarly situated creditors can recover on theirs." *Id.* The

creditor's claim, however, was the creditor's and not one to recover "corporate debts," as Fryberger claims.

In *MS55*, the trustee for a corporate debtor who filed for Chapter 7 bankruptcy protection filed an adversary proceeding against a law firm that served as outside counsel to the debtor, alleging that the law firm engaged in wrongful conduct "in connection with several pre-petition and ostensibly some post-petition financial transactions that [were] at issue." 2007 WL 2669150, at *1. Among other contentions, the law firm alleged that the trustee did not have the power to pursue the claims against the law firm, on behalf of creditors of the debtor, pursuant to 11 U.S.C. § 544(a) because the law firm claimed that the statute endowed "a trustee solely with a hypothetical judgment lien creditor's *avoidance* rights," not the "right to bring *any actions* a hypothetical judgment lien creditor could bring to recover on Debtor's debt." *Id.*, at * 10. Based on the language used in Section 544(a) and case law from other jurisdictions, the court found "that trustees are endowed with more than solely avoidance powers." *Id.*, at * 11. The court also explained that "[t]he holding of *Delgado* explicitly strips creditors of their common law right to bring an action in tort for a debtor corporation's director's breach of his fiduciary duty to all similarly situated creditors, because the bankruptcy case preempts such suits." *Id.*, at * 12. "The necessary corollary to this holding is that once a corporation files for bankruptcy, the trustee, alone, has the authority to bring such suits." *Id.* Necessarily, this means that the trustee alone has the authority to settle such suits. *Id.*

The claims which the plaintiffs pursued in *MS55* were claims for damages incurred by the creditor; not claims for corporate debts. But because the claims were general and would benefit other similarly situated creditors, they could be asserted only by the trustee. *Id.*, at * 13. The

court's decision in *MS55* is consistent with *In re Emoral, Inc.*, 740 F.3d at 879, which Fryberger does not dispute.  *Response*, p. 6.

Instead, Fryberger claims that his copyright infringement claims against Rich Media Exchange, LLC and Ms. Strimbu could not be property of TTV's bankruptcy estate.  Fryberger is wrong.  *See Leventhal v. Schenberg*, 917 F. Supp. 2d 837, 848 (N.D. Ill. 2013) (dismissing copyright claims for lack of standing because claims belong to bankruptcy estate and may only be pursued through trustee); *In re InSITE Servs. Corp., LLC*, 287 B.R. 79, 91 (Bankr. S.D.N.Y. 2002) (denying adversary proceeding defendant's motion to dismiss copyright infringement claims and acknowledging that the claims benefit the corporate debtor's general creditors who would be harmed by dismissing copyright infringement claims); *Clarity Software, LLC v. Fin. Indep. Grp., LLC*, 51 F. Supp. 3d 577, 592–93 (W.D. Pa. 2014) (holding that bankruptcy trustee was real party in interest to copyright infringement claims and plaintiffs lacked standing to pursue the copyright claims, given the bankruptcy).

Fryberger also attempts to distinguish *In re Emoral, Inc.*, 740 F.3d at 879 by claiming that his alleged injuries are particularized only to him; not general to all creditors.  *Response*, p. 7.  Fryberger misapplies the *Emoral* test, however.  In *Emoral*, the plaintiffs also claimed that their claimed damages were particularized, individualized and personal to them.  *Id.* ("While the Diacetyl Plaintiffs focus on the individualized nature of their personal injury claims against *Emoral,* we cannot ignore the fact, and fact it be, that their only theory of liability as against *aroma,* a third party that is not alleged to have caused any direct injury to the Diacetyl Plaintiffs, is that, as a matter of state law, Aaroma constitutes a 'mere continuation' of Emoral such that it has also succeeded to all of Emoral's liabilities.").  The *Emoral* court was unpersuaded, finding

that the asserted claims based on continuing the same practices were not unique to them, but applied to all general creditors of the bankruptcy estate. *Id.*, p. 880.

Here, similarly, Fryberger's claim against Rich Media Exchange, LLC is that it continued TTV's business, received the transfer of videos from TTV, and continued to distribute them. [Doc. # 1]. pp. 7-8, ¶¶ 87-91.  This is a general claim similar to the Trustee's claim that Rich Media Exchange, LLC received and used the transfer of video assets to "to hinder, delay, or defraud creditors of the Debtor, including VPR and Fryberger."  [Doc. # 147-2], pp. 4-8, ¶¶ 32, 36-42 & 48.  The Trustee alleged that the claims inured to the benefit of all TTV's creditors, including VPR and Fryberger, because the transfer of the videos allegedly "reduced the assets of the Debtor against which the Debtor's creditors could collect."  *Id.*, p. 9, ¶ 66.

Similarly, Fryberger's claims against Ms. Strimbu allege that Ms. Strimbu contributed or benefitted financially from TTV's or Rich Media Exchange, LLC's alleged copyright infringement – which involved receiving and using the transferred video assets.  [Doc. # 147-2], pp. 3-9, ¶¶ 21-23, 26, 28-38, 47-52, 62-66.  The Trustee pursued similar claims, claimed that the transfer of the videos reduced the assets available to all of TTV's creditors, and sought an award of damages to be put back into TTV's estate for the benefit of all of TTV's creditors.  [Doc. # 1422], p. 9, ¶ 66.  Fryberger's attempt to distinguish *Emoral* therefore fails.

Finally, Fryberger attempts to distinguish *McKissick v. Yuen*, 618 F.3d 1177, 1185 (10th Cir. 2010) because the executive involved in that case signed the settlement agreement at issue, while Fryberger did not.  *Response*, pp. 7-8.  The distinction is immaterial, however, because the Trustee signed the settlement agreement at issue while serving as TTV's creditors' virtual representative.  *In re Medomak Canning*, 922 F.2d at 901.  The TTV Defendants cited *McKissick*

because the court explained that the use of the phrase "any and all" in the settlement agreement was broad and included the alleged claims based on stock options, rather than just claims arising from the plaintiff's employment termination.   618 F.3d at 1185-86.   Here, the Trustee was empowered to sign the settlement agreement and release all claims on behalf of TTV and its creditors.  *See supra.*  In doing so, the Trustee agreed to broad language that released Rich Media Exchange, LLC and Ms. Strimbu from "any and all liability, obligation, claims, actions, causes of action, demands, damages, punitive damages, treble damages, statutory penalties, costs, attorney's fees, and/or expenses whatsoever arising out of or relating to the Adversary Proceeding."   [Doc. # 147-3], p. 2, ¶ 4.   This language, like the agreement's language in *McKissick*, was broad and cannot be used to "crab or limit" the scope of the release to something narrower.  618 F.3d at 1185.

The courts applied a similar analysis in *DeJean v. United Airlines, Inc.*, 839 P.2d 1153, 1161 (Colo. 1992) and *Mata v. Anderson*, 635 F.3d 1250, 1254 (10th Cir. 2011), which Fryberger does not attempt to distinguish.  The breadth of the release the Trustee provided was substantial and can only be construed reasonable to include Fryberger's claims against Rich Media Exchange, LLC and Ms. Strimbu.  The Court therefore should find that the court-approved settlement in the adversary proceeding bars Fryberger's claims, and enter summary judgment in the TTV Defendants' favor.  *Thomsen v. Famous Dave's of Am., Inc.*, 640 F. Supp. 2d 1072, 1080 (D. Minn. 2009), *aff'd,* 606 F.3d 905 (8th Cir. 2010).

**B.      THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFF'S COPYRIGHT INFRINGEMENT, CONTRIBUTORY COPYRIGHT INFRINGEMENT, AND VICARIOUS COPYRIGHT INFRINGEMENT BECAUSE TTV RETAINED COPYRIGHT OWNERSHIP.**

Fryberger agrees that for all three of his claims – copyright infringement, contributory copyright infringement, and vicarious copyright infringement – Fryberger must establish that he owns the copyrights for the videos in question. *Response*, p. 10. He also does not dispute that to establish these claims, he must prove direct copyright infringement. *La Resolana Architects, PA*, 555 F.3d 1171, 1181 (10th Cir. 2009) (citations omitted).

**1.      Fryberger Has Not Shown He Owns the Copyrights.**

On this element, Fryberger claims he is the "author" of all the videos in question because they "were filed and/or edited by full-time employees of Fryberger sent to destinations to file resorts on behalf of Fryberger." *Response*, p. 10. Fryberger claims to have filmed and edited approximately 260 videos. See [Doc. # 53-21], ¶ 5. He admits being paid $115,333 but claims to be owed an additional $90,000 for his video production and editing efforts. *Id.*, ¶ 9.

As explained in the TTV Defendants' *Response* to Fryberger's summary judgment motion, however, there are genuine fact disputes about who is the legal author of the videos in question. [Doc. # 157], pp. 9-19. TTV arranged the production process, facilitated it, and participated in the production process, as required by its Master Service Agreement with AVW II (dba Apple Vacations). See [Doc. # 79-4]. TTV had its own contractors involved in the production, such as Thom Strimbu, Jon Firestone and Frazer Lockhart. [Doc. # 157], p. 10 (citing deposition testimony). The TTV agents and contractors were, at least, joint authors of the videos, which were "joint works" or a "collective work." *Id.*

> **2.** **Fryberger Transferred Any Claim to Copyrights Through the MSA and His Course of Dealing.**

Here, however, the Court need not resolve the question of whether Fryberger is the exclusive author of the videos in question, or whether they were the product of joint authorship or collective work, because Fryberger transferred any claimed copyrights to TTV through the July 17, 2012 agreement, [Doc. # 152-1], pp. 2-3, and the September 4, 2012 Master Service Agreement ("MSA").  [Doc. # 152-3], p. 4.  In his *Response*, however, Fryberger argues that the MSA "does not transfer Fryberger's copyrights to TTV" because it says "all Confidential Information, and any derivative thereof *remains* the property of TTV…."  *Response*, p. 10 (emphasis in original).  He argues that the term "remains" means that TTV must have originally possessed the copyrights and kept them in the same condition.  *Id.*  He posits that TTV never originally possessed the copyrights to the videos Fryberger participated in creating, so those copyrights could not "remain" with TTV.  *Motion*, pp. 10-11.  Fryberger's argument fails because it is overly technical and formalistic.

The Copyright Act does not require any specific, formal or talismanic language to transfer or assign copyrights. *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999).  All that is required is a writing that demonstrates an intent to transfer copyright ownership. *Id.* (citing *Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989) and 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 10.03[A][2] at 10–37).  The MSA plainly demonstrates Fryberger's and TTV's intent that any copyright Fryberger may have had to the video content would be transferred to TTV. [Doc. # 152-3], p. 4 (providing that "[a]t no time, and for no reason, will [Plaintiff] withhold any video, graphic, or content files owned or applied to TTV work"); *Id.* (providing that TTV would own all

confidential information); *Id.*, p. 5 (all confidential information, copyrights and an derivative work created by Fryberger "remains the property of TTV" and no "no license, intellectual property rights or other rights to the Confidential Information are granted or implied hereby other than the limited right to use for the Purpose.").

Fryberger argues that the MSA is insufficient because he claims "[o]n its face, it does not mention or transfer copyrights." *Response*, p. 11. The MSA, which was not drafted by any lawyers or copyright experts, required Fryberger to transfer to TTV all video content he created – whether finished or unfinished – from the preceding two weeks irrespective of payment. [Doc. # 152-3], p. 3. It also required him to "immediately transfer[]" to TTV "any and all video content content files, finishe[d] or unfinished, graphic files, and partially finished project work." *Id.*, p. 4. Although this language does not refer to copyrights specifically, it was sufficient to transfer ownership to the video content Fryberger created or was involved in creating even if it did not identify specific videos or use the term copyright. *See SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1213 (10th Cir. 2009) ("But when it is clear that the parties contemplated that copyrights transfer, we do not think that a linguistic ambiguity concerning which particular copyrights transferred creates an insuperable barrier invalidating the transaction."); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) (finding agreement transferred copyrights even though it did not mention the word copyright because of the agreement's language and the parties' course of dealing); *Corbello v. DeVito*, 832 F. Supp. 2d 1231, 1245 (D. Nev. 2011) ("A transfer of copyright ownership need not use the words 'transfer' or 'assign' but must indicate an intent to effect an outright transfer of the copyright."); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (explaining that "a qualifying writing

under Section 204(a) need not contain an elaborate explanation nor any particular 'magic words'") (citations omitted).

The MSA also clearly indicates that although Fryberger was to provide "one or more project managers…, one or more Producers, shooter and or editors" for the project, [Doc. #152-3, p. 1], TTV was in control of those production services as they related to Apple Vacations because of TT's Master Service Agreement with Apple Vacations. [Doc. # 79-4], pp. 2-4.  In the MSA, Fryberger also agreed that TTV would have final control over whether a video was "satisfactory" and final control over whether any videos would be "approved." [Doc. # 152-3], p. 2. TTV reserved the right to "white-label"1 any content Fryberger created or edited so that TTV could retain control over the content. *Id.*  Fryberger agreed to follow its travel and expense policies. *Id.*, p. 3. TTV had the right to control staffing on the filming projects and had to approve Fryberger's staff. *Id.*  And Fryberger agreed that "any and all video content files, finishes or unfinished, graphic files, and partially finished project work, will be immediately transferred to TTY hard drives" so that TTV would retain control, including editorial control. *Id.*, p. 4.  When a party reserves the right to control the development, production and dissemination of the content in an agreement, the agreement is sufficient to transfer copyrights even if it does not use the term copyright.  *Armento v. Laser Image, Inc.*, 950 F. Supp. 719, 733 (W.D.N.C. 1996), *aff'd,* 134 F.3d 362 (4th Cir. 1998) (citing *Schiller & Schmidt, Inc.*, 969 F.2d at 413).

Fryberger argues alternatively that the confidentiality clause in the MSA is inapplicable because "TTV did not provide any Confidential Information to Fryberger."  *Response,* p. 11. The testimony upon which Fryberger relies does not support his claim.  Fryberger's counsel asked whether Ms. Strimbu recalled providing any confidential material to Mr. Fryberger, but

did not use the definition of "confidential information" contained in the MSA, which is Ms. Strimbu explained that she did not know what counsel was "referring to." [Doc. # 153-20], pp. 405:9. Mr. Owen, one of Fryberger's employees, testified that he was not told (presumably by Mr. Fryberger) to keep any documents or information provided by TTV confidential. [Doc. # 153-22], pp. 111:21-112:25. Neither witness testified that TTV did not provide any of the information characterized as "confidential information" in the MSA to Fryberger.

Moreover, the MSA's definition of confidential information is very broad. It includes:

[A]ll proprietary information disclosed by TTV to CFF relating to TTV's business and the business of its subsidiaries and affiliates, including business models, market strategies, production processes, trade secrets, know-how, patents, copyrights, financial information, sales distribution strategies. internet and eCommerce strategies, devices, records, data, notes, reports, proposals, lists, correspondence, designs, formulas, developmental or experimental work, computer programs, data bases, customer lists, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property….

[Doc. # 152-3], p. 4. TTV had the relationship with Apple Vacations, and through that relationship, would direct Fryberger and his team to Apple Vacations properties or locations for filming after Apple Vacations provided a statement of work. [Doc. # 79-4], p. 3. TTV was responsible for providing the insurance necessary for the production work and responsible for obtaining filming permits for the properties or destinations where the videos were to be filmed. *Id.*, p. 6. All of this information – which TTV provided to Fryberger to facilitate the filming and production – would be confidential within the MSA's broad definition. [Doc. # 152-3], p. 4.

Simply put, Fryberger would have had nothing to film unless TTV provided Fryberger confidential information. Thus, Fryberger's claim that TTV did not provide any confidential information to Fryberger is refuted by the fact that Fryberger filmed the videos at locations and properties he only knew of because TTV told him about the locations and properties after

receiving a statement of work from Apple.  *See* [Doc. # 157], pp. 23-24.  The MSA expressly provided that any films or other works derived from the information TTV supplied remained confidential information belonging to TTV.  [Doc. # 152-3], p. 4.  For any content developed or edited by Fryberger, Fryberger agreed to transfer that content immediately to TTV, which would make TTV the owner of such information. *Id.*, pp. 3-4. The transfer would, by definition, wrap the content into the "Confidential Information" language in the MSA, *Id.*, p. 4, which the MSA clearly indicated would belong to TTV. *Id.*, p. 5.

Finally, Fryberger's own conduct refutes his claim that he did not intend to transfer ownership of the copyrights.  After Fryberger terminated the MSA, he returned all the videos that he created or edited to TTV, which he termed TTV's "property and data."  [Doc. # 80-4]. Fryberger testified that by March 7, 2013, even though TTV was several months behind on paying his invoices, he was "still delivering video content to TripTelevision."  [Doc. # 115-1], pp. 337:12-18.  He also testified that after he sent his March 22, 2013 email terminating the MSA, he returned the video content and "cleared" the data (meaning the raw footage and edited videos) from his servers because that was what he understood was required to as part of his agreement with TTV.  *Id.*, pp. 339:16 – 347:16.  As in *Armento*, "the behavior of the two parties was at all relevant times consistent with that transfer" provided in the written agreement, requiring summary judgment on Fryberger's copyright claims.  *Armento,* 950 F. Supp. at 734; *see also Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 394 (6th Cir. 2007) (holding Sony Music was owner of renewal copyrights to songs because language in publishing agreements and course of dealing between parties showed Sony was owner of copyrights).

**C.      THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS BASED ON TTV DEFENDANTS' DEFENSE OF IMPLIED LICENSE.**

**1.      Burden of Proof and Elements on Defendants' License Affirmative Defense.**

The parties agree license is an affirmative defense to copyright infringement.  *See Wilson v. Brennan*, 666 F. Supp. 2d 1242, 1260 (D.N.M. 2009), *aff'd,* 390 F. App'x 780 (10th Cir. 2010).  Fryberger also does not dispute that Ms. Strimbu and RME alleged license as an affirmative defense in their Answer.  *Response*, p. 13.

Fryberger argues, however, that the TTV Defendants failed "to incorporate essential elements of an enforceable contract."  *Id.*  He claims that because substantial performance is required to establish breach of contract, it also must be required to establish an implied license.  *Id.* (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).  It is undisputed that TTV paid Fryberger $115,399.10.  [Doc. # 153-6], p. 2.  TTV's payment is evidence of substantial performance.  Even assuming *arguendo* TTV's performance is not substantial enough, the failure of substantial performance merely gives rise to a breach of contract claim.  *Stan Clauson Assocs., Inc. v. Coleman Bros. Const., LLC*, 2013 COA 7, ¶ 9.

Fryberger argues that the implied license he provided was revocable "when there has been a substantial breach of the contract."  *Response*, p. 13.  Fryberger cites *Lulirama, Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 882 (5th Cir. 1997) as support, but *Lulirama* does not support his argument.

In *Lulirama*, the parties signed a written billing statement for services, but there existed "no express, written contract [ ] covering the subject matter of the nonexclusive license."  *Id.*, at 881.  The written billing statement provided for payment to the plaintiff for the production of fifty advertising jingles, but was silent on the licensing of those songs.  *Id.*, at 875.  The court

found that an implied license existed for the use of the songs. *Id.,* at 880-81. Because the implied license was supported by consideration, the court found that the license could not be revoked. *Id.*, at 882. The court pointed out that there was simply no indication that the parties intended the license to be terminable at the will of the contractor. *Id.* *Lulirama* does not hold that a party may revoke an implied license if it substantially breaches the contract. To the contrary, *Lulirama* requires summary judgment because there, as here, Fryberger's "copyright infringement claims are foreclosed regardless of who owns the copyrights" because Fryberger provided an implied license to use the works which was supported by consideration and therefore irrevocable. *Id.*

Fryberger also relies on *Ulloa v. Universal Music and Video Distribution Corp.*, 303 F.Supp.2d 409 (S.D.N.Y. 2004), to support his claim that TTV's material breach of the MSA allows Fryberger to revoke the implied license he provided. Response, p. 17. Fryberger's reliance on *Ulloa* is misplaced. In *Ulloa,* the plaintiff made a recording at a sound studio without discussing any terms for the use of her work prior to recording. *Id.*, at 411. The court explained that it was "clear that there was no meeting of the minds with respect to the use of the Vocal Phrase. Ms. Ulloa had several discussions with Mr. Barnes—an apparent agent of Mr. Carter— with respect to whether her recording would be used in the Izzo song and, if it was used, what sort of compensation and recognition she would receive." *Id.*, at 416-17.

In *Ulloa,* the court explained that the case "is clearly distinguishable from other situations where courts have typically found an implied license [because] those cases generally involve a previous agreement by the two parties that the licensee use the licensor's work and a subsequent dispute concerning either incomplete payment or an inability to agree on exact written terms."

*Id.,* p. 417. In contrast to those cases, in *Ulloa,* "there was no agreement that the Defendants would use the Plaintiff's recording of the Vocal Phrase" so "there could be no 'manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Id.* (quoting *Express Indus. and Terminal Corp. v. New York State Dep't of Transp.,* 93 N.Y.2d 584, 693 N.Y.S.2d 857, 715 N.E.2d 1050, 1053 (1999)).

Here, it is undisputed that there was an agreement for an implied license but an incomplete payment by TTV. Thus, applying *Ulloa,* this is one of those cases where courts typically find an implied license. The Court should apply *Ulloa* and the cases where "courts have typically found an implied license," *Id.*, and enter summary judgment accordingly.

### 2.   The License Fryberger Provided is Irrevocable.

Fryberger concedes in his *Response* that any implied license provided "becomes 'irrevocable if supported by consideration." *Response*, p. 13 (citations omitted). He even concedes that if TTV had paid him fully for the video content, "the implied licenses would have become irrevocable." *Response*, p. 14. Even so, Fryberger claims that the license he provided to the TTV Defendants was revocable. *Response*, pp. 14-17. Fryberger's argument is erroneous.

Only those licenses unsupported by **any** consideration are revocable. An implied license supported by consideration, on the other hand, is irrevocable. *See* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 10.02[B][5] ("[n]onexclusive licenses are revocable absent consideration."); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n. 12 (4th Cir. 1994); *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003); *Lulirama Ltd., Inc.*, 128 F.3d at 882 (5th Cir. 1997). *Keane Dealer Servs., Inc. v. Harts*, 968 F.Supp. 944, 947 (S.D.N.Y. 1997); *Johnson v. Jones*, 885 F.Supp. 1008, 1013 n.6 (E.D. Mich. 1995); *see also Xtomic, LLC v.*

*Active Release Techniques, LLC*, 460 F. Supp. 3d 1147, 1155 (D. Colo. 2020 (finding licenses were irrevocable because defendants paid consideration for the content); *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008) (holding plaintiff granted the defendant "an unlimited, nonexclusive license to retain, use, and modify the software" subject to the copyright dispute which was irrevocable because the defendant "paid consideration" for it).  To determine whether the license provided by Fryberger was supported by consideration, such that it is irrevocable, the Court turns to state law.  *Carson,* 344 F.3d at 452; *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001); *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 60 (1st Cir. 2020).

Under Colorado law, "'[c]onsideration' is a benefit received or something given up as agreed upon between the parties." CJI-Civ. 30:7 (2016); *Troutman v. Webster*, 82 Colo. 93, 96, 257 P. 262, 263-64 (1927).  A promise to pay is sufficient consideration in Colorado.  *See Denver Indus. Corp. v. Kesselring*, 90 Colo. 295, 297, 8 P.2d 767, 768 (1932); *see also City of Colorado Springs v. Mountain View Elec. Ass'n, Inc.*, 925 P.2d 1378 (Colo. App. 1995) ("a promise exchanged for a promise imposes mutual obligations and is sufficient consideration to render a contract enforceable").  A promise to pay in the future also is sufficient consideration. *See DeFeyter v. Riley*, 43 Colo. App. 299, 302, 606 P.2d 453, 455 (1979) (holding that a promise to pay in the future constitutes valuable consideration to support an enforceable contract); *see also Converse v. Zinke*, 635 P.2d 882, 887 (Colo. 1981) ("Failure of consideration, however, should not be confused with lack of consideration for the underlying contract, since failure of consideration generally refers to failure of performance of a contract.") (citing J. Calamari and J. Perillo, Contracts, § 11-25 (2d ed. 1977)).

The MSA clearly evidences TTV's promise to pay in exchange for use and distribution of the content produced or edited by Fryberger. This promise to pay is consideration under Colorado law. *Compass Bank v. Kone*, 134 P.3d 500, 502 (Colo. App. 2006). Further, it is undisputed that TTV paid Fryberger $115,399.10, which is sufficient consideration under the MSA. *Robert K. Schader, P.C. v. Etta Indus., Inc.*, 892 P.2d 363, 365 (Colo. App. 1994) (partial payment to attorney, combined with valuable services provided by attorney, sufficient to show agreement was supported by consideration).

Without examining Colorado law on consideration, much less distinguishing the clear weight of authority showing that TTV's promise to pay was sufficient consideration, and without reconciling the undisputed fact that TTV paid Fryberger $115,399.10 under the MSA, Fryberger relies on inapposite authority to support his claim that the license he provided was revocable. Fryberger's arguments fail for several reasons.

First, Fryberger argues that the TTV Defendants "exaggerate the holding in *Effects* beyond the issues presented in that case." *Response*, p. 14. Fryberger argues that the court in *Effects* did not "discuss whether and when an implied license can be revoked." *Id.* Fryberger misses the point. In *Effects*, the court "conclude[ed] that Effects impliedly granted nonexclusive licenses to Cohen and his production company to incorporate the special effects footage into 'The Stuff' and to New World Entertainment to distribute the film." 908 F.2d 555, 559. The court then addressed the plaintiff's argument that the defendant's failure to pay full price for the content resulted in a loss of the license granted:

> Plaintiff argues that an implied license is an equitable remedy, for which Cohen does not qualify because he hasn't paid in full the agreed-to price for the footage. We reject this argument. Plaintiff cites no authority for the proposition that an implied license is equitable in nature; it seems to us to be a

creature of law, much like any other implied-in-fact contract. *See, e.g., Landsberg v. Scrabble Crossword Game Players, Inc.,* 802 F.2d 1193, 1199 (9th Cir.1986). In any event, it is unclear that a balancing of equities would favor plaintiff, who has been paid almost $56,000 for footage that is worthless to Cohen should plaintiff prevail.

Nor can we construe payment in full as a condition precedent to implying a license. Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language. *Sulmeyer v. United States* (*In re Bubble Up Delaware, Inc.*), 684 F.2d 1259, 1264 (9th Cir.1982). The language of the October 29, 1984, agreement doesn't support a conclusion that full payment was a condition precedent to Cohen's use of the footage. Moreover, Effects's president conceded at his deposition that he never told Cohen that a failure to pay would be viewed as copyright infringement. CR 24 at 29.

*Id.*, p. 559 n. 7. Thus, the *Effects* court expressly considered, and rejected, an argument identical to Fryberger's – that TTV's failure to pay all amounts due resulted in a loss of the license Fryberger granted. It is true that the *Effects* court did not use the term "irrevocable," but the court's holding has been construed to support the rule that a license supported by consideration is irrevocable. *Gagnon,* 542 F.3d at 757. In any event, *Effects* supports summary judgment in the TTV Defendants' favor here.

Second, Fryberger cites *Rano v. Sipa Press, Inc.*, 987 F.2d 580 (9th Cir. 1993) for the proposition that implied licenses supported by consideration are revocable. *Response,* p. 15. Fryberger's reliance on *Rano* is misplaced. In *Rano*, the plaintiff photographer and defendant distributor had an explicit licensing agreement. *Id.*, at 583. The explicit agreement provided the defendant with a license to use the plaintiff's photographs in exchange for storage and development of plaintiff's negatives and fifty percent royalties. *Id.* When the defendant failed to provide plaintiff with the agreed upon royalties, the photographer terminated the agreement. *Id.*

The *Rano* court considered whether the photographer, Rano, had the right to rescind the written licensing agreement for a breach. *Id.*, at 586. The court explained that "[a] breach will

justify rescission of a licensing agreement only when it is 'of so material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties.... [The breach must constitute] a total failure in the performance of the contract.'" *Id.* (quoting *Affiliated Hospital Prod., Inc. v. Merdel Game Mfg. Co*., 513 F.2d 1183, 1186 (2d Cir. 1975)) (citing *Nolan v. Williamson Music, Inc*., 300 F.Supp. 1311, 1317 (S.D.N.Y.1969), *aff'd sub. nom. Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394 (2d Cir.1974) and 3 Nimmer § 10.15[A] at 116–18). The court held Rano had no right to rescind the agreement because he had not presented evidence sufficient to show such a substantial breach that there was a failure to consideration. *Id.* The court therefore affirmed summary judgment. *Id.*

Here, Fryberger has not sought rescission of the MSA or any licensing agreement. Instead, Fryberger concedes a valid contract exists which is supported by consideration. [Doc. #1], ¶¶ 25-27, 122-126. By suing and claiming damages for TTV's breach of contract, Fryberger may not rescind the contract, even assuming he had plead a claim for rescission. *See EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.*, 900 P.2d 113 (Colo.1995); *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636, 642 (Colo. App. 1999).

Moreover, under Colorado law, rescission would only be a proper remedy where "there is such a substantial breach of the contract that the conduct of the parties is inconsistent with its continued existence." *Tromp v. Martinez*, 719 P.2d 380, 381 (Colo. App. 1986) (citing *Joyce v. Davis*, 539 F.2d 1262 (10th Cir.1976)). The substantial breach must be by both parties. *Kaiser*, 992 P.2d at 642. Here, there is no evidence of a total breach by both parties. Instead, it is undisputed that TTV paid Fryberger $115,399.10 pursuant to the MSA, totaling 47% of the total

amount invoiced.  [Doc. # 106], p. 1, n.1.  Thus, there could be no rescission under Colorado law; nor under the facts of *Rano*.

Third, Fryberger cites *Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-CV-01118-KLM, 2015 WL 1816479, at *10 (D. Colo. Apr. 20, 2015) as reaching "the same holding" as *Rano*. *Response*, p. 15.  Fryberger misreads *Millennium, Inc.*  There, the court granted summary judgment in the defendant's favor and concluded that the plaintiff "granted [d]efendant an implied nonexclusive license to use the copyrighted material, the Ad," in the manner the defendant used it because the defendant "requested that [p]laintiff create the Ad, [p]laintiff created the Ad and delivered it to [d]efendant," which is what plaintiff intended.  *Id.*, at * 10.  The *Millennium, Inc.* court did not use the term revoke or revocable.  It nowhere held "that implied licenses *could* be revoked when a licensee fails to pay for the license," as Fryberger claims.  *Response*, p. 16.

Finally, Fryberger cites *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749 (11th Cir. 1997) to support his claim that the license he provided to TTV was revocable or rescindable.  *Jacob Maxwell* does not support Fryberger's argument.  In that case, the plaintiff songwriter explicitly granted the defendants a license his use his song at defendants' minor league baseball games.  *Id.*, at 751.  The court interpreted the orally-granted license as an implied nonexclusive license.  *Id.*, at 752.  The plaintiff "revoked" the permission to use the song in October and the team did not use the song after this time.  *Id.*, at 751.

The plaintiff sued the team for its use of the song prior plaintiff's rescission.  *Id.*  The issue of irrevocability was not raised and was immaterial to the court's decision.  Importantly, however, *Jacob Maxwell, Inc.*, 110 F.3d at 753-54, supports TTV's argument that the licenses

given to TTV were not conditioned upon payment in the absence of an express agreement providing such a condition.  There, as in here, the putative copyright holder could have made "payment of JMI's costs and public recognition of authorship … conditions precedent to the granted right to play." *Id.*, at 753 (citing Restatement (Second) of Contracts § 225 (1981)). "In such a case, absent performance of the conditions, the 'license' would not have issued and the Miracle's public performances of the song would have violated JMI's copyright."  *Id.* (citations omitted). However, the putative copyright holder:

> …did not make payment and recognition conditions precedent to the permission he gave to play the song. "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981). "Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." *Effects Associates*, 908 F.2d at 559 n. 7.  On July 2, 1993, JMI, through its president, Albion, expressly granted the Miracle permission to play the song before payment was tendered or recognition received. Thereafter, Albion did not withdraw permission although he attended many games and heard the song played, still without payment or recognition, on various occasions.  Indeed, he wrote to Kuhn encouraging the Miracle to continue to play the song.  Under these circumstances, we cannot say that JMI's permission to play was conditioned on prior payment and public recognition.

*Id.*  Applying the same reasoning here, Fryberger did not make payment a condition precedent to TTV's use or distribution of the video content.  His claim to a restricted or revoked license (or one unsupported by any consideration) therefore fails.

### 3.    A Breach of Contract Does Not Mean Fryberger's License Was Revocable.

Unable to overcome the weight of authority holding that the license Fryberger provided was irrevocable because it was not supported by consideration and cannot be rescinded, Fryberger instead resorts to breach of contract arguments.  He argues that Colorado courts apply five factors to determine whether a party's breach of contract is substantial.  *Response,* p. 18.

Fryberger applies these five factors to support his claim that TTV's breach of the MSA was substantial. *Id.*, pp. 18-23.

Fryberger's argument is misguided because his breach of contract claim – asserted only against TripTelevision – is immaterial to his claims against Rich Media Exchange, LLC or Ms. Strimbu. *Reinicke v. Creative Empire LLC*, 38 F. Supp. 3d 1192, 1203–04 (S.D. Cal. 2014), *aff'd,* 669 F. App'x 470 (9th Cir. 2016) (disputes about the amounts defendant should have paid to plaintiff were immaterial because it was undisputed that defendant paid plaintiff around $9000 for implied license, which was sufficient to render the license irrevocable even if the payment was not paid the total payment due).  When, as here, a defendant pays some consideration but not the full amount due under the contract, the implied license given remains effective and is irrevocable.  *Gagnon*, 542 F.3d at 757; *see also Fontana v. Harra*, No. CV 12-10708, 2013 WL 990014, at *5–6 (C.D. Cal. 2013) ("Failure to provide payment in full can only void an implied license if the agreement giving rise to the license contains a conditions precedent clause requiring full payment," which would be improbable if the implied license is derived from oral statements or "course of performance," and "[c]onsequently, absent unusual circumstances, when a plaintiff enters an oral agreement to create a work for a defendant to copy or distribute, the plaintiff's proper course of action for seeking full payment is a breach of contract case, not a copyright infringement case.") (citations omitted).

### 4.    Lack of Substantial Performance Gives Rise to a Breach of Contract Claim, Not a Copyright Infringement Claim.

Relatedly, Fryberger argues that the TTV Defendants "cannot claim the benefit of implied licenses because TTV failed to substantially perform its obligations under the MSA."

*Response*, 24.  Fryberger recites Colorado law regarding substantial performance and applies it to urge the Court to conclude TTV did not substantially perform its obligations under the MSA.

Whether a party has substantially performed is a question of fact.  *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005) (citing *Kaiser v. Mkt. Square Disc. Liquors, Inc.,* 992 P.2d 636, 640 (Colo. App. 1999).  It is undisputed that TTV paid Fryberger for the work be performed.  [Doc. # 53-21], ¶ 5.  Whether that payment amounts to substantial performance is a question of fact over which there are genuine disputes.  Thus, summary judgment normally would be inappropriate.  *See Arenberg v. Cent. United Life Ins. Co.*, 18 F. Supp. 2d 1167, 1177 (D. Colo. 1998) (denying summary judgment because genuine issues of material fact existed about whether party's performance was substantial).

Here, however, the disputed issues of material fact about substantial performance are immaterial because Fryberger has not alleged a breach of contract claims against Ms. Strimbu or Rich Media Exchange, LLC.  His only claims are for copyright infringement, contributory copyright infringement, and vicarious copyright infringement.  Those claims fail because the implied license Fryberger provided was supported by consideration, irremovable and not rescinded, regardless of whether TTV paid completely the amounts due under the MSA.  *See Effects Associates*, 908 F.2d at 559 n. 7; *Reinicke*, 38 F. Supp. 3d at 1203–04; *see also Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp. 3d 964, 971 (E.D. Mich. 2016) ("While Plaintiff may have a claim for breach of contract, promissory estoppel, or unjust enrichment for an ownership interest in Compendia, Plaintiff cannot maintain a copyright infringement case where he consented to Defendants' use of his copyrighted software code.").

    **5.**      **Fryberger Has Not Established that the TTV Defendants' Use of the Material Exceeded the Scope of the Implied License.**

Finally, because the TTV Defendants proved the existence of an implied license, to overcome summary judgment, Fryberger was required to prove that the TTV Defendants exceeded the scope of the license.  *See Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) (citing *I.a.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)); *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).

Fryberger did not satisfy his burden of showing the TTV Defendants exceeded the scope of the license given.  He did not even attempt to, arguing instead only that he did not provide an implied license to Rich Media Exchange, LLC.  *Response*, p. 28.  Fryberger's argument is immaterial because TTV owned the content pursuant to the MSA, as described above.

Even if TTV did not own the content, however, the Court must find that TTV enjoyed an implied license for the reasons described above and in [Doc. # 80], p. 2-17 and [Doc. # 152], pp. 15-28.  Rich Media Exchange, LLC enjoys the same rights because TTV sold all of its video assets, including the, including the licenses at issue here, to RME.  [Doc. # 115-2], p. 41:4-7.  TTV held the video assets, including the video content from Fryberger, in Streamside Productions, LLC, which managed the assets.  [Doc. # 115-3], p 519:13 – 520:10.  In March 2015, Streamside sold all of its assets – including its video content and licenses – to RME through an Asset Purchase Agreement.  [Doc. # 115-4].  As a result, RME now owns all the original videos that were owned by or licensed to TTV.

"Federal copyright law does not govern ownership of an original embodiment of a work…." *Steward Software Co., LLC v. Kopcho,* 266 P.3d 1085, 1088 (Colo. 2011). Thus,

Fryberger's argument that Rich Media Exchange, LLC had no license or right to the content is misplaced because it does not account for the valid transfer of TTV's property or assets pursuant to the Asset Purchase Agreement.

Fryberger has admitted that he granted nonexclusive implied licenses to TTV to use the videos.  [Doc. # 106], pp. 2 & p. 19-22. He also has admitted that the scope of the implied licenses included distribution to third-parties for promotional purposes.  [Doc. # 115-1], pp. 125:6-126:4. The scope therefore would include distribution of the videos to Rich Media Exchange and Ms. Strimbu.  Fryberger has not identified any admissible facts suggesting that Rich Media Exchange, LLC or Ms. Strimbu exceeded the scope of the license by holding onto the video content.

Further, the MSA specifically provided that TTV obtained the intellectual property rights in any derivative work created from the video content from Fryberger that TTV was authorized to use or distribute.  [Doc. # 152-3], p. 4.  As a successor in interest to TTV's rights to the video content, RME was free to receive the video content, derivative works and licenses to the intellectual property at issue.  *See Ariel (UK) Ltd. v. Reuters Grp. PLC*, No. 05 CIV. 9646 (JFK), 2006 WL 3161467, at *6 (S.D.N.Y. Oct. 31, 2006), *aff'd*, 277 F. App'x 43 (2d Cir. 2008).

Finally, Fryberger claims that the TTV Defendants did not "specifically address Fryberger's claims against Ms. Strimbu."  *Response*, p. 29.  Fryberger errs because the TTV Defendants argued those claims are barred by the settlement [Doc. # 152], pp. 3-11, that TTV owns the copyrights to the material such that Ms. Strimbu was allowed to use it, *Id.*, pp. 11-15, and Ms. Strimbu benefitted from the irrevocable implied license.  *Id.*, pp. 18-28,  Fryberger's claims against Ms. Strimbu are for contributory and vicarious infringement, which both fail

because both claims require "someone to have directly infringed the copyright." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d at 1181. Because there was no direct infringement, Ms. Strimbu cannot be liable for contributory or vicarious infringement. *Id.*

### III.   CONCLUSION.

The Court should enter summary judgment in TTV Defendants' favor because the Settlement Agreement and Release in TripTelevision's ("TTV's") bankruptcy is binding on Plaintiff and released all claims here.  Further, the Court should enter summary judgment on Plaintiff's copyright claims (Claims One through Three) because TTV owns all copyrights under the MSA.  Finally, the Court should enter summary judgment because the undisputed evidence shows the TTV Defendants had an irrevocable nonexclusive license to use the videos, which defeats Plaintiff's copyright claims.

DATED:  April 5, 2021.

*s/ Troy R. Rackham*
Troy R. Rackham
SPENCER FANE, LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
trackham@spencerfane.com

*Attorney for Defendants Kulin Strimbu and Rich Media Exchange, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas P. Howard
Scott E. Brenner
William C. Groh
Thomas P. Howard, LLC
842 W South Boulder Rd., #200
Louisville, CO 80027
*Attorneys for Plaintiff*

Andrew D. Ringel
Conor Boyle
Hall & Evans, LLC
1001 17th Street, Suite 300
Denver, CO 80202

*Attorneys for Apple Vacations, LLC*

s/ *Troy R. Rackham*